# McCORMICK *v.* UNITED STATES

No. 89–1918. Argued January 8, 1991—Decided May 23, 1991

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and MARSHALL, SCALIA, KENNEDY, and SOUTER, JJ., joined. SCALIA, J., filed a concurring opinion, *post*, p. 276. STEVENS, J., filed a dissenting opinion, in which BLACKMUN and O'CONNOR, JJ., joined, *post*, p. 280.

*Rudolph L. Di Trapano* argued the cause for petitioner. With him on the briefs was *Rebecca A. Baitty.*

*Christopher J. Wright* argued the cause for the United States. With him on the brief were *Solicitor General Starr, Assistant Attorney General Mueller, Deputy Solicitor General Bryson,* and *Richard A. Friedman.*

JUSTICE WHITE delivered the opinion of the Court.

This case requires us to consider whether the Court of Appeals properly affirmed the conviction of petitioner, an elected public official, for extorting property under color of official right in violation of the Hobbs Act, 18 U. S. C. § 1951. We also must address the affirmance of petitioner's conviction for filing a false income tax return.

I

Petitioner Robert L. McCormick was a member of the West Virginia House of Delegates in 1984. He represented a district that had long suffered from a shortage of medical doctors. For several years, West Virginia had allowed foreign medical school graduates to practice under temporary permits while studying for the state licensing exams. Under this program, some doctors were allowed to practice under temporary permits for years even though they repeatedly failed the state exams. McCormick was a leading advocate and supporter of this program.

In the early 1980's, following a move in the House of Delegates to end the temporary permit program, several of the temporarily licensed doctors formed an organization to press their interests in Charleston. The organization hired a lobbyist, John Vandergrift, who in 1984 worked for legislation

that would extend the expiration date of the temporary permit program. McCormick sponsored the House version of the proposed legislation, and a bill was passed extending the program for another year. Shortly thereafter, Vandergrift and McCormick discussed the possibility of introducing legislation during the 1985 session that would grant the doctors a permanent medical license by virtue of their years of experience. McCormick agreed to sponsor such legislation.

During his 1984 reelection campaign, McCormick informed Vandergrift that his campaign was expensive, that he had paid considerable sums out of his own pocket, and that he had not heard anything from the foreign doctors. Tr. 167–168. Vandergrift told McCormick that he would contact the doctors and see what he could do. *Id.*, at 168. Vandergrift contacted one of the foreign doctors and later received from the doctors $1,200 in cash. Vandergrift delivered an envelope containing nine $100 bills to McCormick. Later the same day, a second delivery of $2,000 in cash was made to McCormick. During the fall of 1984, McCormick received two more cash payments from the doctors. McCormick did not list any of these payments as campaign contributions,[1] nor did he report the money as income on his 1984 federal income tax return. And although the doctors' organization kept detailed books of its expenditures, the cash payments were not listed as campaign contributions. Rather, the entries for the payments were accompanied only by initials or other codes signifying that the money was for McCormick.

In the spring of 1985, McCormick sponsored legislation permitting experienced doctors to be permanently licensed without passing the state licensing exams. McCormick spoke at length in favor of the bill during floor debate, and the bill ultimately was enacted into law. Two weeks after the legislation was enacted, McCormick received another cash payment from the foreign doctors.

---

[1] West Virginia law prohibits cash campaign contributions in excess of $50 per person. W. Va. Code §3–8–5d (1990).

Following an investigation, a federal grand jury returned an indictment charging McCormick with five counts of violating the Hobbs Act,[2] by extorting payments under color of official right, and with one count of filing a false income tax return in violation of 26 U. S. C. § 7206(1),[3] by failing to report as income the cash payments he received from the foreign doctors. At the close of a 6-day trial, the jury was instructed that to establish a Hobbs Act violation the Government had to prove that McCormick induced a cash payment and that he did so knowingly and willfully by extortion. As set out in the margin, the court defined "extortion" and other terms and elaborated on the proof required with respect to the extortion counts.[4]

---

[2] The Hobbs Act, 18 U. S. C. §1951, provides in relevant part as follows:

"(a) Whoever in any way or degree obstructs, delays, or affects commerce . . . by robbery or extortion . . . in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

"(b) As used in this section—

 . . . . .

"(2) The term 'extortion' means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."

[3] Section § 7206 of the Internal Revenue Code provides in part that:

"Any person who—

"(1) . . . Willfully makes and subscribes any return . . . which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter . . . shall be guilty of a felony . . . ."

[4] The following are the relevant portions of the instructions discussing the extortion charges:

"Now, a definition of some of the terms used.

"Extortion means the obtaining of property from another, with his consent, either induced by the wrongful use of fear or induced under color of official right.

"The term 'wrongful' means the obtaining of property unfairly and unjustly by one having no lawful claim thereto.

"As to inducement, the United States must prove that the defendant induced the person or persons described in the indictment to part with prop-

262

The next day the jury informed the court that it "would like to hear the instructions again with particular emphasis on the definition of extortion under the color of official right

erty, a term which includes money. It is charged that the defendant did so under color of official right.

"In proving this element, it is enough that the government prove beyond a reasonable doubt that the benefactor transferred something of significant value, here alleged to be money, to the public official with the expectation that the public official would extend to him some benefit or refrain from some harmful action, and the public official accepted the money knowing it was being transferred to him with that expectation by the benefactor and because of his office.

"In determining whether the defendant induced a person or persons described in the indictment to part with property at the time of the alleged events in counts one and two, occurring as you'll recall on June 1, 1984 as alleged in the indictment and if you believe it as set forth in some of the evidence adduced, you may take into account all the surrounding circumstances, including any word spoken by or actions of the defendant, if any, prior thereto or in connection therewith. In determining whether the defendant induced a person or persons described in the indictment to part with property alleged in counts three, four, and five, you may take into account all the surrounding circumstances, including any course of conduct on the part of the defendant, if any, which may bear thereon.

"And so, inducement can be in the overt form of a demand, or in a more subtle form such as custom or expectation such as might have been communicated by the nature of the defendant's prior conduct of his office, if any.

"As to color of official right, in this case the government has charged that extortion was committed under color of official right, in that the defendant is charged with committing extortion by virtue of his office as a member of the West Virginia House of Delegates.

"Extortion under color of official right means the obtaining of money by a public official when the money obtained was not lawfully due and owing to him or to his office.

"Extortion under color of official right does not require proof of specific acts by the public official demonstrating force, threats, or the use of fear so long as the victim consented because of the office or position held by the official.

"Where, as here, the indictment charges that the alleged extortion was committed under color of official right, the government need not prove that the alleged victim of the extortion, here the unlicensed doctors, was, in fact, in a state of fear at the time the payments in question were made,

and on the law as regards the portion of moneys received that does not have to be reported as income." App. 27. The court then reread most of the extortion instructions to the

---

although they may have been, that is, the evidence may indicate to you conceivably that that is the case, but that, of course, is not of particular moment.

"Extortion under color of official right is committed whenever a public officer makes wrongful use of his office to obtain money not due to him or his office. It is the public official's misuse of his office which, by itself, supplies proof of the necessary element of coercion. Therefore, the wrongful use of official power need not be accompanied by actual or threatened force, violence, or fear.

"If the public official knows the motivation of the victim to make any payment focuses on the public official's office, and money is obtained by the public official which was not lawfully due and owing to him or the office he represented, that is sufficient to satisfy the government's burden of showing a misuse of office and extortion under color of official right. The mere voluntary payment of money, however, does not constitute extortion.

"Finally, to prove extortion under color of official right, the government need not establish that the defendant actually possessed authority over the passage of the legislation in question. Similarly, the payments need not have been made directly or ultimately to the public official. It is sufficient if the evidence shows that the victim was induced to deliver money to someone as a result of the defendant's office.

"There has been evidence in this case that for some years before 1984, as well as during the 1984 and 1985 legislative session, the defendant was a leading supporter of legislation to permit foreign medical school graduates who did not meet all the medical licensing requirements to practice in areas of West Virginia that needed physicians.

"It would not be illegal, in and of itself, for the defendant to solicit or accept political contributions from foreign doctors who would benefit from this legislation.

"In order to find Mr. McCormick guilty of extortion, you must first be convinced beyond a reasonable doubt that the payment alleged in a given count in the indictment was made by or on behalf of the doctors with the expectation that such payment would influence Mr. McCormick's official conduct, and with the knowledge on the part of Mr. McCormick that they were paid to him with that expectation by virtue of the office he held.

"It is not illegal, in and of itself, for an elected legislator to solicit or accept legitimate campaign contributions, on behalf of himself or other legislators, from individuals who have a special interest in pending legisla-

jury, but reordered some of the paragraphs and made the following significant addition:

"Extortion under color of official right means the obtaining of money by a public official when the money

tion. The solicitation or receipt of such contributions violates the federal extortion law only when the payment is wrongfully induced under color of official right.

"Many public officials receive legitimate political contributions from individuals who, the official knows, are motivated by a general gratitude toward him because of his position on certain issues important to them, or even in the hope that the good will generated by such contributions will make the official more receptive to their cause.

"The mere solicitation or receipt of such political contributions is not illegal.

"It is not necessary that the government prove in this case that the defendant misused his public office in the sense that he granted some benefit or advantage to the person or persons, here the unlicensed doctors, who allegedly paid him money. Though the unlicensed doctors may have gotten no more than their due in the defendant's performance of his official duties, the defendant's receipt of money, if you find that to have occurred, for the performance of such acts is a misuse of office. When a public official accepts the payment for an implicit promise of fair treatment, if any such promise there were, there is an inherent threat that without the payment, the public official would exercise his discretion in an adverse manner. A claim that a public official's actions would have been the same whether or not he received the alleged payments is, for this purpose, irrelevant and is no defense to the charges contained in counts one through five of the indictment.

"So it is not necessary that the government prove that the defendant committed or promised to commit a quid pro quo, that is, consideration in the nature of official action in return for the payment of the money not lawfully owed. Such a quid pro quo may, of course, be forthcoming in an extortion case or it may not. In either event it is not an essential element of the crime.

"While it is not necessary to prove that the defendant specifically intended to interfere with interstate commerce, it is necessary as to this issue that the government prove that the natural consequences of the acts alleged in the indictment would be to delay, interrupt, or adversely affect interstate commerce, which means the flow of commerce or business activities between two or more states.

"Potential future effect on commerce is enough to satisfy this element." App. 17–22.

obtained was not lawfully due and owing to him or to his office. Of course, extortion does not occur where one who is a public official receives a legitimate gift or a voluntary political contribution even though the political contribution may have been made in cash in violation of local law. Voluntary is that which is freely given without expectation of benefit." *Id.*, at 30.

It is also worth noting that with respect to political contributions, the last two paragraphs of the supplemental instructions on the extortion counts were as follows:

"It would not be illegal, in and of itself, for Mr. McCormick to solicit or accept political contributions from foreign doctors who would benefit from this legislation.

"In order to find Mr. McCormick guilty of extortion, you must be convinced beyond a reasonable doubt that the payment alleged in a given count of the indictment was made by or on behalf of the doctors with the expectation that such payment would influence Mr. McCormick's official conduct, and with knowledge on the part of Mr. McCormick that they were paid to him with that expectation by virtue of the office he held." *Id.*, at 33–34.

The jury convicted McCormick of the first Hobbs Act count (charging him with receiving the initial $900 cash payment) and the income tax violation but could not reach verdicts on the remaining four Hobbs Act counts. The District Court declared a mistrial on those four counts.

The Court of Appeals affirmed, observing that nonelected officials may be convicted under the Hobbs Act without proof that they have granted or agreed to grant some benefit or advantage in exchange for money paid to them and that elected officials should be held to the same standard when they receive money other than "legitimate" campaign contributions. 896 F. 2d 61 (CA4 1990). After stating that McCormick could not be prosecuted under the Hobbs Act for receiving voluntary campaign contributions, *id.*, at 65, the court re-

jected McCormick's contention that conviction of an elected official under the Act requires, under all circumstances, proof of a *quid pro quo, i. e.*, a promise of official action or inaction in exchange for any payment or property received, *id.*, at 66. Rather, the court interpreted the statute as not requiring such a showing where the parties never intended the payments to be "legitimate" campaign contributions. *Ibid.* After listing seven factors to be considered in making this determination and canvassing the record evidence, the court concluded:

> "Under these facts, a reasonable jury could find that McCormick was extorting money from the doctors for his continued support of the 1985 legislation. Further, the evidence supports the conclusion that the money was never intended by any of the parties to be a campaign contribution. Therefore, we refuse to reverse the jury's verdict against McCormick for violating the Hobbs Act."
> *Id.*, at 67.

The Court of Appeals also affirmed the income tax conviction.

Because of disagreement in the Courts of Appeals regarding the meaning of the phrase "under color of official right" as it is used in the Hobbs Act,[5] we granted certiorari.

---

[5] Until the early 1970's, extortion prosecutions under the Hobbs Act rested on allegations that the consent of the transferor of property had been "induced by wrongful use of actual or threatened force, violence, or fear"; public officials had not been prosecuted under the "color of official right" phrase standing alone. Beginning with the conviction involved in *United States* v. *Kenny*, 462 F. 2d 1205 (CA3 1972), however, the federal courts accepted the Government's submission that because of the disjunctive language of §1951(b)(2), allegations of force, violence, or fear were not necessary. Only proof of the obtaining of property under claims of official right was necessary. Furthermore, every Court of Appeals to have construed the phrase held that it did not require a showing that the public official "induced" the payor's consent by some affirmative act such as a demand or solicitation. Although there was some difference in the language of these holdings, the "color of official right" element required no more

498 U. S. 807 (1990). We reverse and remand for further proceedings.

___

than proof of the payee's acceptance knowing that the payment was made for the purpose of influencing his official actions. In 1984, however, the Court of Appeals for the Second Circuit, en banc, held that some affirmative act of inducement by the official had to be shown to prove the Government's case. *United States* v. *O'Grady*, 742 F. 2d 682 (1984). In 1988, the Ninth Circuit, en banc, agreed with the Second Circuit, overruling a prior decision expressing the majority rule. *United States* v. *Aguon*, 851 F. 2d 1158 (1988). Other courts have been unimpressed with the view expressed in *O'Grady* and *Aguon*. See, *e. g.*, *United States* v. *Evans*, 910 F. 2d 790, 796–797 (CA11 1990), cert. pending, No. 90–6105; *United States* v. *Spitler*, 800 F. 2d 1267, 1274 (CA4 1986); *United States* v. *Paschall*, 772 F. 2d 68, 71 (CA4 1985).

The conflict on this issue is clear, but this case is not the occasion to resolve it. The trial court instructed that proof of inducement was essential to the Government's case, but stated that the requirement could be satisfied by showing the receipt of money by McCormick knowing that it was proffered with the expectation of benefit and on account of his office, proof that would be inadequate under the *O'Grady* view of inducement. McCormick did not challenge this instruction in the trial court or the Court of Appeals; nor does he here.

We do address, however, the issue of what proof is necessary to show that the receipt of a campaign contribution by an elected official is violative of the Hobbs Act. The trial court and the Court of Appeals were of the view that it was unnecessary to prove that, in exchange for a campaign contribution, the official specifically promised to perform or not to perform an act incident to his office. The Court of Appeals, based on its reading of *United States* v. *Trotta*, 525 F. 2d 1096 (CA2 1975), stated that the Court of Appeals for the Second Circuit had a similar view. Other Courts of Appeals appear to require proof of a *quid pro quo*. *United States* v. *Bibby*, 752 F. 2d 1116, 1127, n. 1 (CA6 1985); *United States* v. *Haimowitz*, 725 F. 2d 1561, 1573, 1577 (CA11 1984); *United States* v. *Dozier*, 672 F. 2d 531, 537 (CA5 1982).

JUSTICE STEVENS in dissent makes the bald assertion that "[i]t is perfectly clear . . . that the evidence presented to the jury was adequate to prove beyond a reasonable doubt that petitioner knowingly used his public office to make or imply promises or threats to his constituents for purposes of pressuring them to make payments that were not lawfully due him." *Post*, at 281. Contrary to JUSTICE STEVENS' apparent suggestion, the main issue throughout this case has been whether under proper instructions the

## II

McCormick's challenge to the judgment below affirming his conviction is limited to the Court of Appeals' rejection of his claim that the payments made to him by or on behalf of the doctors were campaign contributions, the receipt of which did not violate the Hobbs Act. Except for a belated claim not properly before us,[6] McCormick does not challenge any rulings of the courts below with respect to the application of the Hobbs Act to payments made to nonelected officials or to payments made to elected officials that are properly determined not to be campaign contributions. Hence, we do not consider how the "under color of official right" phrase is to be

---

evidence established a Hobbs Act violation and, as our opinion indicates, it is far from "perfectly clear" that the Government has met its burden in this regard.

[6] In briefing the merits in this Court, McCormick has argued that the Hobbs Act was never intended to apply to corruption involving local officials and that in any event an official has not acted under color of official right unless he falsely represents that by virtue of his office he has a legal right to the money or property he receives. These arguments were not presented to the courts below. They are not expressly among the questions presented in the petition for certiorari and are only arguably subsumed by the questions presented. Nor in view of the language of the Hobbs Act and the many cases approving the conviction of local officials under the Act can it be said that plain error occurred in the lower courts for failure to recognize that the Act was inapplicable to the extortion charges brought against McCormick. As for the false-pretenses argument, *United States* v. *French*, 628 F. 2d 1069 (CA8 1980); *United States* v. *Mazzei*, 521 F. 2d 639 (CA3 1975) (en banc); *United States* v. *Price*, 507 F. 2d 1349, 1350 (CA4 1974) *(per curiam);* and *United States* v. *Braasch*, 505 F. 2d 139, 150–151 (CA7 1974), have rejected the claim and many other convictions have been affirmed where it is plain that there was no misrepresentation of legal right. In view of these cases and the origin of the phrase "under color of official right," see Lindgren, The Elusive Distinction Between Bribery and Extortion: From the Common Law to the Hobbs Act, 35 UCLA L. Rev. 815 (1988), no plain error occurred below in failing to interpret the phrase as McCormick argues. Accordingly, the submission does not comply with our rules and is untimely, and we do not address it further. *Berkemer* v. *McCarty*, 468 U. S. 420, 443, and n. 38 (1984).

interpreted and applied in those contexts. In two respects, however, we agree with McCormick that the Court of Appeals erred.

A

First, we are quite sure that the Court of Appeals affirmed the conviction on legal and factual grounds that were never submitted to the jury. Although McCormick challenged the adequacy of the jury instructions to distinguish between campaign contributions and payments that are illegal under the Hobbs Act, the Court of Appeals' opinion did not examine or mention the instructions given by the trial court. The court neither dealt with McCormick's submission that the instructions were too confusing to give adequate guidance to the jury, nor, more specifically, with the argument that although the jury was instructed that voluntary campaign contributions were not vulnerable under the Hobbs Act, the word "voluntary" as used "in several places during the course of these instructions," App. 30, was defined as "that which is freely given without expectation of benefit." *Ibid.* Neither did the Court of Appeals note that the jury was not instructed in accordance with the court's holding that the difference between legitimate and illegitimate campaign contributions was to be determined by the intention of the parties after considering specified factors.[7] Instead, the Court of Appeals, after announcing a rule of law for determining when payments are made under color of official right,

---

[7] "Some of the circumstances that should be considered in making this determination include, but are not limited to, (1) whether the money was recorded by the payor as a campaign contribution, (2) whether the money was recorded and reported by the official as a campaign contribution, (3) whether the payment was in cash, (4) whether it was delivered to the official personally or to his campaign, (5) whether the official acted in his official capacity at or near the time of the payment for the benefit of the payor or supported legislation that would benefit the payor, (6) whether the official had supported similar legislation before the time of the payment, and (7) whether the official had directly or indirectly solicited the payor individually for the payment." 896 F. 2d 61, 66 (1990).

went on to find sufficient evidence in the record to support findings that McCormick was extorting money from the doctors for his continued support of the 1985 legislation, and further that the parties never intended any of the payments to be a campaign contribution.

It goes without saying that matters of intent are for the jury to consider. *Cheek* v. *United States*, 498 U. S. 192, 203 (1991). It is also plain that each of the seven factors that the Court of Appeals thought should be considered in determining the parties' intent presents an issue of historical fact. Thus even assuming the Court of Appeals was correct on the law, the conviction should not have been affirmed on that basis but should have been set aside and a new trial ordered. *Bollenbach* v. *United States*, 326 U. S. 607, 613–614 (1946); *Cole* v. *Arkansas*, 333 U. S. 196, 201–202 (1948). Cf. *Kotteakos* v. *United States*, 328 U. S. 750, 763 (1946); *Cabana* v. *Bullock*, 474 U. S. 376, 384 (1986); *Carpenters* v. *United States*, 330 U. S. 395, 408 (1947). If for no other reason, therefore, the judgment of the Court of Appeals must be reversed and the case remanded for further proceedings.[8]

---

[8] JUSTICE STEVENS apparently refuses to recognize that the Court of Appeals affirmed McCormick's conviction on legal and factual theories never tried before the jury. As indicated above, for that reason alone, and without dealing with the Court of Appeals' other errors, the judgment must be reversed. JUSTICE STEVENS erroneously suggests, see *post*, at 289, n. 4, that the procedural posture of this case is no different than the posture in *Arizona* v. *Fulminante*, 499 U. S. 279 (1991), a case in which the Court affirmed the lower court's judgment even though it rejected the lower court's reasoning. The analogy JUSTICE STEVENS attempts to draw is inapt because it misses the point that in a criminal case a defendant is constitutionally entitled to have the issue of criminal liability determined by a jury in the first instance. In *Fulminante*, the Court *reversed* the defendant's conviction; it did not impose criminal liability on a theory different from that relied upon by the Arizona Supreme Court. This Court has never held that the right to a jury trial is satisfied when an appellate court retries a case on appeal under different instructions and on a different theory than was ever presented to the jury. Appellate courts are not permit-

## B

We agree with the Court of Appeals that in a case like this it is proper to inquire whether payments made to an elected official are in fact campaign contributions, and we agree that the intention of the parties is a relevant consideration in pursuing this inquiry. But we cannot accept the Court of Appeals' approach to distinguishing between legal and illegal campaign contributions. The Court of Appeals stated that payments to elected officials could violate the Hobbs Act without proof of an explicit *quid pro quo* by proving that the payments "were never intended to be *legitimate* campaign contributions." 896 F. 2d, at 66 (emphasis added).[9] This issue, as we read the Court of Appeals' opinion, actually involved two inquiries; for after applying the factors the Court of Appeals considered relevant, it arrived at two conclusions: first, that McCormick was extorting money for his continued support of the 1985 legislation and "[f]urther," *id.*, at 67, that the money was never intended by the parties to be a campaign contribution at all. The first conclusion, especially when considered in light of the second, asserts that the campaign contributions were illegitimate, extortionate payments.

---

ted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.

[9] The record shows that McCormick did not ask for an instruction to the effect that proof of an explicit *quid pro quo* was necessary to convict an elected official under the Hobbs Act for extorting a campaign contribution. Indeed, at one point McCormick's counsel stated that there was no such requirement. Tr. 1067. Furthermore, the last two paragraphs of the supplemental instructions on extortion, App. 33–34, were almost identical to McCormick's Requested Instruction No. 11–A, 13 Record, which fell short of requiring for conviction a promise to perform an official act in return for a campaign contribution. In the Court of Appeals, however, McCormick argued that such an undertaking by the official was essential. The Court of Appeals chose to address the submission and, as we understand it, rejected it. The issue is fairly subsumed in the questions presented here and is argued in the briefs. Hence, we reach and decide the question.

This conclusion was necessarily based on the factors that the court considered, the first four of which could not possibly by themselves amount to extortion. Neither could they when considered with the last three more telling factors, namely, whether the official acted in his official capacity at or near the time of the payment for the benefit of the payor; whether the official had supported legislation before the time of the payment; and whether the official had directly or indirectly solicited the payor individually for the payment. Even assuming that the result of each of these seven inquiries was unfavorable to McCormick, as they very likely were in the Court of Appeals' view, we cannot agree that a violation of the Hobbs Act would be made out, as the Court of Appeals' first conclusion asserted.

Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, "under color of official right." To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory language more explicit

than the Hobbs Act contains to justify a contrary conclusion. Cf. *United States* v. *Enmons*, 410 U. S. 396, 411 (1973).

This is not to say that it is impossible for an elected official to commit extortion in the course of financing an election campaign. Political contributions are of course vulnerable if induced by the use of force, violence, or fear. The receipt of such contributions is also vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or undertaking. This is the receipt of money by an elected official under color of official right within the meaning of the Hobbs Act.

This formulation defines the forbidden zone of conduct with sufficient clarity. As the Court of Appeals for the Fifth Circuit observed in *United States* v. *Dozier*, 672 F. 2d 531, 537 (1982):

> "A moment's reflection should enable one to distinguish, at least in the abstract, a legitimate solicitation from the exaction of a fee for a benefit conferred or an injury withheld. Whether described familiarly as a payoff or with the Latinate precision of *quid pro quo*, the prohibited exchange is the same: a public official may not demand payment as inducement for the promise to perform (or not to perform) an official act."

The United States agrees that if the payments to McCormick were campaign contributions, proof of a *quid pro quo* would be essential for an extortion conviction, Brief for United States 29–30, and quotes the instruction given on this subject in 9 Department of Justice Manual § 9–85A.306, p. 9–1938.134 (Supp. 1988–2): "[C]ampaign contributions will not be authorized as the subject of a Hobbs Act prosecution unless they can be proven to have been given in return for the performance of or abstaining from an official act; otherwise any campaign contribution might constitute a violation."

We thus disagree with the Court of Appeals' holding in this case that a *quid pro quo* is not necessary for conviction under the Hobbs Act when an official receives a campaign contribution.[10] By the same token, we hold, as McCormick urges, that the District Court's instruction to the same effect was error.[11]

## III

The Government nevertheless insists that a properly instructed jury in this case found that the payment at issue was not a campaign contribution at all and that the evidence amply supports this finding. The instructions given here are not a model of clarity, and it is true that the trial court instructed that the receipt of voluntary campaign contributions did not violate the Hobbs Act. But under the instructions a contribution was not "voluntary" if given with *any* expectation of benefit; and as we read the instructions, taken as a whole, the jury was told that it could find McCormick guilty of extortion if any of the payments, even though a campaign contribution, was made by the doctors with the expectation that McCormick's official action would be influenced for their benefit and if McCormick knew that the payment was made with that expectation. It may be that the jury found that none of the payments was a campaign contribution, but it is mere speculation that the jury convicted on this basis rather than on the impermissible basis that even though the first payment was such a contribution, McCormick's receipt of it was a violation of the Hobbs Act.

The United States submits that McCormick's conviction on the tax count plainly shows that the jury found that the first

---

[10] As noted previously, see *supra*, at 268–269, McCormick's sole contention in this case is that the payments made to him were campaign contributions. Therefore, we do not decide whether a *quid pro quo* requirement exists in other contexts, such as when an elected official receives gifts, meals, travel expenses, or other items of value.

[11] In so holding, we do not resolve the conflict mentioned in n. 5, *supra*, with respect to the necessity of proving inducement.

payment was not a campaign contribution. Again, we disagree, for the instruction on the tax count told the jury, among other things, that if the money McCormick received "constituted *voluntary* political contributions . . . it was . . . not taxable income," App. 25 (emphasis added), and failure to report it was not illegal. The jury must have understood "voluntary" to mean what the court had said it meant, *i. e.*, as "that which is freely given without expectation of benefit." *Id.*, at 30. The jury might well have found that the payments were campaign contributions but not voluntary because they were given with an expectation of benefit. They might have inferred from this fact, although they were not instructed to do so, that the payments were taxable even though they were contributions. Furthermore, the jury was instructed that if it found that McCormick did not use the money for campaign expenses or to reimburse himself for such expenses, then the payments given him by the doctors were taxable income *even if* the jury found that the doctors intended the payments to be campaign contributions. See *id.*, at 24–26, 36–37. Contrary to the Government's contention, therefore, by no means was the jury required to determine that the payments from the doctors to McCormick were not campaign contributions before it could convict on the tax count. The extortion conviction cannot be saved on this theory.

## IV

The Court of Appeals affirmed McCormick's conviction for filing a false return on the sole ground that the jury's finding that McCormick violated the Hobbs Act "under these facts implicitly indicates that it rejected his attempts to characterize at least the initial payment as a campaign contribution." 896 F. 2d, at 67. This conclusion repeats the error made in affirming the extortion conviction. The Court of Appeals did not examine the record in light of the instructions given the jury on the extortion charge but considered the evidence in light of its own standard under which it found that the pay-

ments were not campaign contributions. Had the court focused on the instructions actually given at trial, it would have been obvious that the jury could have convicted McCormick of the tax charge even though it was convinced that the payments were campaign contributions but was also convinced that the money was received knowing that it was given with an expectation of benefit and hence was extorted. The extortion conviction does not demonstrate that the payments were not campaign contributions and hence taxable.

Of course, the fact that the Court of Appeals erred in affirming the extortion conviction and erred in relying on that conviction in affirming the tax conviction does not necessarily exhaust the possible grounds for affirming on the tax count. But the Court of Appeals did not consider the verdict on that count in light of the instructions thereon and then decide whether, in the absence of the Hobbs Act conviction, McCormick was properly convicted for filing a false income tax return. That option will be open on remand.

## V

Accordingly, we reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE SCALIA, concurring.

I agree with the Court's conclusion and, given the assumption on which this case was briefed and argued, with the reasons the Court assigns. If the prohibition of the Hobbs Act, 18 U. S. C. § 1951, against receipt of money "under color of official right" includes receipt of money from a private source for the performance of official duties, that ambiguously described crime assuredly need not, and for the reasons the Court discusses should not, be interpreted to cover campaign contributions with anticipation of favorable future action, as opposed to campaign contributions in exchange for an explicit promise of favorable future action.

I find it unusual and unsettling, however, to make such a distinction without any hint of a justification in the statutory text: § 1951 contains not even a colorable allusion to campaign contributions or *quid pro quos*. I find it doubly unsettling because there is another interpretation of § 1951, contrary to the one that has been the assumption of argument here, that would render the distinction unnecessary. While I do not feel justified in adopting that interpretation without briefing and argument, neither do I feel comfortable giving tacit approval to the assumption that contradicts it. I write, therefore, a few words concerning the text of this statute and the history that has produced the unexamined assumption underlying our opinion.

Section 1951(a) provides: "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . shall be fined not more than $10,000 or imprisoned not more than twenty years, or both." Section 1951(b)(2) defines "extortion" as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The relevant provisions were enacted as part of the Anti-Racketeering Act of 1934, 48 Stat. 979, and were carried forward without change in the Hobbs Act of 1948. For more than 30 years after enactment, there is no indication that they were applied to the sort of conduct alleged here.

When, in the 1960's, it first occurred to federal prosecutors to use the Hobbs Act to reach what was essentially the soliciting of bribes by state officials, courts were unimpressed with the notion. They thought that public officials were not guilty of extortion when they accepted, or even when they requested, *voluntary* payments designed to influence or procure their official action. *United States* v. *Hyde*, 448 F. 2d 815, 833 (CA5 1971) ("The distinction from bribery is therefore . . . the fear and lack of voluntariness on the part of

the victim"); *United States* v. *Addonizio*, 451 F. 2d 49, 72 (CA3 1971) ("[W]hile the essence of bribery is voluntariness, the essence of extortion is duress"); *United States* v. *Kubacki*, 237 F. Supp. 638, 641 (ED Pa. 1965) (same). Not until 1972 did any court apply the Hobbs Act to bribery. See *United States* v. *Kenny*, 462 F. 2d 1205, 1229 (CA3 1972) ("kickbacks" by construction contractors to public officials established extortion "under color of official right," despite absence of "threat, fear, or duress"). That holding was soon followed by the Seventh Circuit in *United States* v. *Braasch*, 505 F. 2d 139, 151 (1974), which said that "[s]o long as the motivation for the payment focuses on the recipient's office, the conduct falls within the ambit of 18 U. S. C. § 1951." While *Kenny*, *Braasch*, and subsequent cases were debated in academic writing, compare Ruff, Federal Prosecution of Local Corruption: A Case Study in the Making of Law Enforcement Policy, 65 Geo. L. J. 1171 (1977) (criticizing *Kenny*), with Lindgren, The Elusive Distinction between Bribery and Extortion: From the Common Law to the Hobbs Act, 35 UCLA L. Rev. 815 (1988) (defending *Kenny*), the Courts of Appeals accepted the expansion with little disagreement, see, *e. g.*, *United States* v. *Harding*, 563 F. 2d 299, 302–303 (CA6 1977); *United States* v. *Hathaway*, 534 F. 2d 386, 393 (CA1 1976); *United States* v. *Hall*, 536 F. 2d 313, 320–321 (CA10 1976); but see *United States* v. *Cerilli*, 603 F. 2d 415, 426–437 (CA3 1979) (Aldisert, J., dissenting), and this Court has never had occasion to consider the matter.

It is acceptance of the assumption that "under color of official right" means "on account of one's office" that brings bribery cases within the statute's reach, and that creates the necessity for the reasonable but textually inexplicable distinction the Court makes today. That assumption is questionable. "The obtaining of property . . . under color of official *right*" more naturally connotes some false assertion of official *entitlement* to the property. This interpretation

might have the effect of making the § 1951 definition of extortion comport with the definition of "extortion" at common law. One treatise writer, describing "extortion by a public officer," states: "At common law it was essential that the money or property be obtained under color of office, that is, under the pretense that the officer was entitled thereto by virtue of his office. The money or thing received must have been claimed or accepted in right of office, and the person paying must have yielded to official authority." 3 R. Anderson, Wharton's Criminal Law and Procedure 790–791 (1957).

It also appears to be the case that under New York law, which has long contained identical "under color of official right" language and upon which the Hobbs Act is said to have been based, see Ruff, *supra*, at 1183, bribery and extortion were separate offenses. An official charged with extortion could defend on the ground that the payment was voluntary and thus he was guilty only of bribery. *People* v. *Feld*, 28 N. Y. S. 2d 796, 797 (Sup. Ct. 1941); see *People* v. *Dioguardi*, 8 N. Y. 2d 260, 273–274 (App. Div. 1960). I am aware of only one pre-Hobbs Act New York prosecution involving extortion "under color of official right," and there the defendant, a justice of the peace, had extracted a payment from a litigant on the false ground that it was due him as a court fee. *People* v. *Whaley*, 6 Cow. 661, 661–663 (N. Y. 1827).

Finally, where the United States Code explicitly criminalizes conduct such as that alleged in the present case, it calls the crime bribery, not extortion—and like all bribery laws I am aware of (but unlike § 1951 and all other extortion laws I am aware of) it punishes not only the person receiving the payment but the person making it. See 18 U. S. C. § 201(b) (criminalizing bribery of and by federal officials).*

---

*Section 201(b)(2) prescribes penalties for anyone who

"being a public official or person selected to be a public official, directly or indirectly, corruptly demands, seeks, receives, accepts, or agrees to re-

Cf. 18 U. S. C. § 872 (criminalizing extortion by federal officials, making no provision for punishment of person extorted). McCormick, though not a federal official, is subject to federal prosecution for bribery under the Travel Act, 18 U. S. C. § 1952, which criminalizes the use of interstate commerce for purposes of bribery—and reaches, of course, both the person giving and the person receiving the bribe.

I mean only to raise this argument, not to decide it, for it has not been advanced and there may be persuasive responses. See, *e. g.,* Lindgren, *supra,* at 837–889 (arguing that under early common law bribery and extortion were not separate offenses and that extortion did not require proof of a coerced payment). But unexamined assumptions have a way of becoming, by force of usage, unsound law. Before we are asked to go further down the road of making reasonable but textually unapparent distinctions in a federal "payment for official action" statute—as we unquestionably will be asked, see *ante,* at 267, n. 5—I think it well to bear in mind that the statute may not exist.

JUSTICE STEVENS, with whom JUSTICE BLACKMUN and JUSTICE O'CONNOR join, dissenting.

An error in a trial judge's instructions to the jury is not ground for reversal unless the defendant has made, and preserved, a specific objection to the particular instruction in question. Rule 30 of the Federal Rules of Criminal Procedure provides, in part:

---

ceive or accept anything of value personally or for any other person or entity, in return for:

"(A) being influenced in performance of any official act;

"(B) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud on the United States; or

"(C) being induced to do or omit to do any act in violation of the official duty of such official or person."

Section 201(b)(1) provides penalties for anyone who "corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official" for the same three purposes.

"No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection."

This Court's disapproval of portions of the reasoning in the Court of Appeals' opinion, 896 F. 2d 61 (CA4 1990), is not a sufficient ground for reversing its judgment. It is perfectly clear that the indictment charged a violation of the Hobbs Act, 18 U. S. C. § 1951, and that the evidence presented to the jury was adequate to prove beyond a reasonable doubt that petitioner knowingly used his public office to make or imply promises or threats to his constituents for purposes of pressuring them to make payments that were not lawfully due him. Apart from its criticism of the Court of Appeals' opinion, the Court's reversal of petitioner's conviction, in the final analysis, rests on its view that the jury instructions were incomplete because they did not adequately define the concept of "voluntary" contribution in distinguishing such contributions from extorted payments, and because the instructions did not require proof that petitioner made an "explicit" promise (or threat) in exchange for a campaign contribution. In my opinion the instructions were adequate and, in any event, to the extent that they were ambiguous, petitioner failed to preserve a proper objection.

In the Court of Appeals, petitioner argued that his conviction under the Hobbs Act was not supported by sufficient evidence. In reviewing such a contention, the appellate court must, of course, view the evidence in the light "most favorable to the Government." *Glasser* v. *United States*, 315 U. S. 60, 80 (1942). So viewed, it is perfectly clear that petitioner could properly have been found by the jury to be guilty of extortion.

Petitioner's crime was committed in two stages. Toward the end of May 1984, petitioner held an "unfriendly" conversation with Vandergrift, the representative of the unlicensed doctors, which the jury could have interpreted as an

implied threat to take no action on the licensing legislation unless he received a cash payment as well as an implicit promise to support the legislation if an appropriate cash payment was made. Because the statute applies equally to the wrongful use of political power by a public official as to the wrongful use of threatened violence, that inducement was comparable to a known thug's offer to protect a storekeeper against the risk of severe property damage in exchange for a cash consideration. Neither the legislator nor the thug needs to make an explicit threat or an explicit promise to get his message across.

The extortion was completed on June 1, 1984, when Vandergrift personally delivered an envelope containing nine $100 bills to petitioner. The fact that the payment was not reported as a campaign contribution, as required by West Virginia law, or as taxable income, as required by federal law, together with other circumstantial evidence, adequately supports the conclusion that the money was intended as a payment to petitioner personally to induce him to act favorably on the licensing legislation. His covert acceptance of the cash—indeed, his denial at trial that he received any such payment—supports the conclusion that petitioner understood the payers' intention and that he had implicitly (at least) promised to provide them with the benefit that they sought.

As I understand its opinion, the Court would agree that these facts would constitute a violation of the Hobbs Act if the understanding that the money was a personal payment rather than a campaign contribution had been explicit rather than implicit and if the understanding that, in response to the payment, petitioner would endeavor to provide the payers with the specific benefit they sought had also been explicit rather than implicit. In my opinion there is no statutory requirement that illegal agreements, threats, or promises be in writing, or in any particular form. Subtle extortion is just as wrongful—and probably much more common—than the kind of express understanding that the Court's opinion seems to require.

Nevertheless, to prove a violation of the Hobbs Act, I agree with the Court that it is essential that the payment in question be contingent on a mutual understanding that the motivation for the payment is the payer's desire to avoid a specific threatened harm or to obtain a promised benefit that the defendant has the apparent power to deliver, either through the use of force or the use of public office. In this sense, the crime does require a *"quid pro quo."* Because the use of the Latin term *"quid pro quo"* tends to confuse the analysis, however, it is important to clarify the sense in which the term was used in the District Court's instructions.

As I have explained, the crime of extortion was complete when petitioner accepted the cash pursuant to an understanding that he would not carry out his earlier threat to withhold official action and instead would go forward with his contingent promise to take favorable action on behalf of the unlicensed physicians. What he did thereafter might have evidentiary significance, but could neither undo a completed crime nor complete an uncommitted offense. When petitioner took the money, he was either guilty or not guilty. For that reason, proof of a subsequent *quid pro quo*—his actual support of the legislation—was not necessary for the Government's case. And conversely, evidence that petitioner would have supported the legislation anyway is not a defense to the already completed crime. The thug who extorts protection money cannot defend on the ground that his threat was only a bluff because he would not have smashed the shopkeeper's windows even if the extortion had been unsuccessful. It was in this sense that the District Court correctly advised the jury that the Government did not have to prove the delivery of a postpayment *quid pro quo*, as illustrated by these excerpts from the instructions:

> "It would not be illegal, in and of itself, for the defendant to solicit or accept political contributions from foreign doctors who would benefit from this legislation.

284

"In order to find Mr. McCormick guilty of extortion, you must first be convinced beyond a reasonable doubt that the payment alleged in a given count in the indictment was made by or on behalf of the doctors with the expectation that such payment would influence Mr. McCormick's official conduct, and with the knowledge on the part of Mr. McCormick that they were paid to him with that expectation by virtue of the office he held.

"It is not illegal, in and of itself, for an elected legislator to solicit or accept legitimate campaign contributions, on behalf of himself or other legislators, from individuals who have a special interest in pending legislation. The solicitation or receipt of such contributions violates the federal extortion law only when the payment is wrongfully induced under color of official right.

"Many public officials receive legitimate political contributions from individuals who, the official knows, are motivated by a general gratitude toward him because of his position on certain issues important to them, or even in the hope that the good will generated by such contributions will make the official more receptive to their cause.

"The mere solicitation or receipt of such political contributions is not illegal.

"It is not necessary that the government prove in this case that the defendant misused his public office in the sense that he granted some benefit or advantage to the person or persons, here the unlicensed doctors, who allegedly paid him money. Though the unlicensed doctors may have gotten no more than their due in the defendant's performance of his official duties, the defendant's receipt of money, if you find that to have occurred, for the performance of such acts is a misuse of office. When a public official accepts the payment for an implicit promise of fair treatment, if any such promise there were,

there is an inherent threat that without the payment, the public official would exercise his discretion in an adverse manner. A claim that a public official's actions would have been the same whether or not he received the alleged payments is, for this purpose, irrelevant and is no defense to the charges contained in counts one through five of the indictment.

"So it is not necessary that the government prove that the defendant committed or promised to commit a quid pro quo, that is, consideration in the nature of official action in return for the payment of the money not lawfully owed. Such a quid pro quo may, of course, be forthcoming in an extortion case or it may not. In either event it is not an essential element of the crime." App. 20–22.[1]

---

[1] The supplemental charge to the jury was equally clear:

"It is not necessary that the government prove in this case that the defendant misused his public office in the sense that he granted some benefit or advantage to the person or persons, here the unlicensed doctors, who allegedly paid him money. Though the unlicensed doctors may have gotten no more than their due in the defendant's performance of his official duties, the defendant's receipt of money, if you find that to have occurred, for the performance of such acts is a misuse of office. Whether a public official accepts a payment for an implicit promise of fair treatment, if any such promise there were, there is an inherent threat that without the payment, the public official would exercise his discretion in an adverse manner. A claim that a public official's actions would have been the same whether or not he received the alleged payments is, for this purpose, irrelevant and is no defense to the charges contained in counts one through five of this indictment." App. 32.

"It is not illegal, in and of itself, for an elected legislator to solicit or accept campaign contributions on behalf of himself or other legislators from individuals who have a special interest in pending legislation. The solicitation or receipt of such contributions violates the federal extortion law—and that's what we're concerned with, the federal extortion law—only when the payment is wrongfully induced under color of official right.

"Many public officials in this country receive political contributions from individuals who, the official knows, are motivated by a general gratitude toward him because of his position on certain issues important to them, or

This Court's criticism of the District Court's instructions focuses on this single sentence:

> "'Voluntary is that which is freely given without expectation of benefit.'" *Ante,* at 265; see also *ante,* at 269, 272–273, 274–275.

The Court treats this sentence as though it authorized the jury to find that a legitimate campaign contribution is involuntary and constitutes extortion whenever the contributor expects to benefit from the candidate's election.[2] In my

---

even in the hope that the goodwill generated by such contributions will make the official more receptive to their cause.

"The mere solicitation or receipt of such political contributions is not of itself illegal." *Id.,* at 33.

"It would not be illegal, in and of itself, for Mr. McCormick to solicit or accept political contributions from foreign doctors who would benefit from this legislation.

"In order to find Mr. McCormick guilty of extortion, you must be convinced beyond a reasonable doubt that the payment alleged in a given count of the indictment was made by or on behalf of the doctors with the *expectation* that such payment would influence Mr. McCormick's official conduct, and with knowledge on the part of Mr. McCormick that they were paid to him with that expectation by virtue of the office he held." *Id.,* at 33–34.

[2] "Serving constituents and supporting legislation that will benefit the district and individuals and groups therein is the everyday business of a legislator. It is also true that campaigns must be run and financed. Money is constantly being solicited on behalf of candidates, who run on platforms and who claim support on the basis of their views and what they intend to do or have done. Whatever ethical considerations and appearances may indicate, to hold that legislators commit the federal crime of extortion when they act for the benefit of constituents or support legislation furthering the interests of some of their constituents, shortly before or after campaign contributions are solicited and received from those beneficiaries, is an unrealistic assessment of what Congress could have meant by making it a crime to obtain property from another, with his consent, 'under color of official right.' To hold otherwise would open to prosecution not only conduct that has long been thought to be well within the law but also conduct that in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures, as they have been from the beginning of the Nation. It would require statutory lan-

opinion this is a gross misreading of that sentence in the context of the entire set of instructions.

In context, the sentence in question advised the jury that a payment is voluntary if it is made without the expectation of a benefit that is specifically contingent upon the payment. An expectation that the donor will benefit from the election of a candidate who, once in office, would support particular legislation regardless of whether or not the contribution is made, would not make the payment contingent or involuntary in that sense; such a payment would be "voluntary" under a fair reading of the instructions, and the candidate's solicitation of such contributions from donors who would benefit from his or her election is perfectly legitimate. If, however, the donor and candidate know that the candidate's support of the proposed legislation is contingent upon the payment, the contribution may be found by a jury to have been involuntary or extorted.

In my judgment, the instructions, read as a whole, properly focused the jury's attention on the critical issue of the candidate's and contributor's intent at the time the specific payment was made.[3] But even if they were ambiguous, or subject to improvement, they certainly do not provide a basis

---

guage more explicit than the Hobbs Act contains to justify a contrary conclusion." *Ante*, at 272–273.

[3] "In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Boyd* v. *United States*, 271 U. S. 104, 107 (1926). While this does not mean that an instruction by itself may never rise to the level of constitutional error, see *Cool* v. *United States*, 409 U. S. 100 (1972), it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *Cupp* v. *Naughten*, 414 U. S. 141, 146–147 (1973).

for reversing the conviction when the petitioner failed to advise the District Court of an error this Court now believes it has detected.

In the Court of Appeals, petitioner did not argue that any specific instruction was erroneous or that the District Court erred by refusing to give any instruction that petitioner had tendered. Nor, at trial, did petitioner request the judge to instruct the jury that any promise or threat in exchange for the payment had to be explicit or to clarify the meaning of a "voluntary" contribution as distinguished from an illegally induced payment. In fact, the District Court's instruction that a finding that an "implicit promise of fair treatment" on the part of petitioner in exchange for the contribution would support a Hobbs Act conviction came in part from petitioner's tendered instructions at trial. For example, Defendant's Requested Instruction Number 8–A in the District Court proposed that the jury be instructed as follows:

> "To prove the crime of extortion under color of official right, the government must establish a demand for payment by the official.
>
> "This demand for payment may be established by the words or conduct of the defendant himself. It also may be communicated by the nature of the defendant's prior conduct of his office." 13 Record.

Similarly, Defendant's Requested Instruction Number 11–A read as follows:

> "In order to find Mr. McCormick guilty of extortion, you must be convinced beyond a reasonable doubt that the payments alleged in the indictment were paid by the doctors with the expectation that they would influence Mr. McCormick's official conduct, and with the knowledge on the part of Mr. McCormick that they were paid to him with that expectation." *Ibid.*

As to the Government's Requested Instruction Number 17, which began with the sentence, "'When a public official ac-

cepts a payment for an *implicit* promise of fair treatment, there is an inherent threat that, without the payment, the public official would exercise his discretion in an adverse manner'" (emphasis added), petitioner did not object in any way to the legal substance. See 7 Tr. 1070 (Dec. 5, 1988). See also *id.*, at 1071, 1077–1078 (petitioner's counsel conceding that express *or implied* promise by McCormick to support legislation in exchange for contribution would support finding of Hobbs Act violation).

Given that the District Court's instructions to the jury largely tracked the instructions requested by petitioner at trial, I can see no legitimate reason for this Court now to find these instructions inadequate. Because I am convinced that the petitioner was fairly tried and convicted by a properly instructed jury, I would affirm the judgment of the Court of Appeals. Of course, an affirmance of the Court of Appeals' *judgment* would not mean that we necessarily affirm the Court of Appeals' *opinion*.[4] It is sufficient that an affirmance of McCormick's conviction rest on the legal and factual

---

[4] The Court cites no authority for its novel suggestion that an appellate court's judgment affirming a criminal conviction should be reversed even though no reversible error occurred during the trial. Just this Term, the Court in *Arizona* v. *Fulminante*, 499 U. S. 279 (1991), affirmed a state court judgment without approving of the appellate court's analysis. In that case, the Arizona Supreme Court had held that a criminal defendant's coerced confession should have been suppressed and that no harmless-error analysis could be used to save the conviction. This Court, while affirming the judgment that the conviction had to be reversed, nevertheless held that the harmless-error rule was applicable to coerced confessions, but that the error in the particular case was not harmless. The Court's disapproval of a lower appellate court's analysis does not, therefore, necessarily require a reversal of its judgment. See also *K mart Corp.* v. *Cartier, Inc.*, 485 U. S. 176, 185 (1988) ("Although we reject the Court of Appeals' analysis, we nevertheless agree with its conclusion . . ."); *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842 (1984) ("[S]ince this Court reviews judgments, not opinions, we must determine whether the Court of Appeals' legal error resulted in an erroneous judgment . . ." (footnote omitted)).

theories actually presented to the jury, whether or not these theories were the ones relied upon by the Court of Appeals.

I respectfully dissent.