16 F.3d 412
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Paul Wayne DERRICK, Defendant-Appellant.
 No. 92-5084.
 United States Court of Appeals, Fourth Circuit.
 Submitted Dec. 13, 1993.
Decided Feb. 3, 1994.
 
 Appeal from the United States District Court for the District of South Carolina, at Columbia. Falcon B. Hawkins, Chief District Judge. (CR-91-91)
 James H. Lengel, Holler, Olive, Merry, Lengel & Garner, Columbia, SC, for appellant.
 John S. Simmons, U.S. Atty., John W. McIntosh, First Asst. U.S. Atty., Cheryl A. Lydon, Asst. U.S. Atty., Columbia, SC, for appellee.
 D.S.C.
 REVERSED AND REMANDED.
 Before WIDENER and NIEMEYER, Circuit Judges, and CHAPMAN, Senior Circuit Judge.
 OPINION
 PER CURIAM:
 
 
 1
 Paul Wayne Derrick was convicted of conspiracy to violate the Hobbs Act, Title 18 U.S.C. Sec. 1951, and violation of the same Act. The prosecution arose out of "Operation Lost Trust," the code name for an investigation into corruption in the South Carolina House of Representatives conducted by the Federal Bureau of Investigation. Appellant's convictions resulted from $1,000 in currency paid to him, while he was a member of the South Carolina House of Representatives, by one Ronald L. Cobb, and his agreement with others to support and expedite the passage of a bill pending in the House in exchange for monetary compensation.
 
 
 2
 The FBI created a scam operation that had as its focus a House bill that would legalize pari-mutuel betting at horse and dog race tracks in South Carolina. Ronald Cobb, a former member of the House, was acting as a paid confidential informant for the FBI, and he maintained an office in the AT & T building across the street from the State House and a suite at the Town House Hotel. Both the office and suite were under video and audio surveillance. A video tape of Cobb paying the $1,000 to Derrick in exchange for Derrick's support of the effort to move the pari-mutuel bill to the top of the House calendar, so it could be voted on in the 1990 term, was shown to the jury, which also heard and saw tapes of other conversations between Cobb and other alleged co-conspirators.
 
 
 3
 The jury found that the receipt of this payment violated the Hobbs Act and that the appellant's actions were part of a conspiracy to violate said Act. Defendant has contended and still contends that the payment was a campaign contribution which violated no state or federal law.
 
 
 4
 The appellant raises eight issues on appeal, but it is not necessary for us to consider and decide each issue because we are remanding for a new trial as a result of defective jury instructions. However, appellant argues that the evidence was insufficient to sustain his convictions, and it is necessary for us to consider and decide this issue.
 
 I.
 
 5
 The issue of the jury instructions has been considered and decided in our recent opinions in United States v. Taylor, 966 F.2d 830 (4th Cir.1992) and 993 F.2d 382 (4th Cir.1993). The instructions given at Derrick's trial in May 1991 may have been adequate when they were given, but they now conflict with the holding in McCormick v. United States, 111 S.Ct. 1807 (1991). We remanded Taylor for a new trial based on McCormick, but after the Supreme Court decided Evans v. United States, 112 S.Ct. 1881 (1992), we reconsidered the jury instructions and concluded in Taylor II that the instructions given at Taylor's trial were still defective and that he was prejudiced thereby and a new trial was ordered.
 
 
 6
 The jury instructions as to the Hobbs Act given at Derrick's trial were the same as the instructions given in Taylor, and the same result is required. Therefore, the case must be remanded for a new trial in light of our opinions in Taylor I and Taylor II.
 
 II.
 
 7
 Although we are reversing the convictions and remanding for a new trial, Derrick contends that he is entitled to a complete reversal and judgment of acquittal because the evidence was not sufficient to sustain his conviction on either count. This claim of insufficiency of the evidence also includes his claim of lack of jurisdiction because the evidence was insufficient to prove his actions had an effect on interstate commerce, an essential element in a Hobbs Act prosecution.
 
 
 8
 A defendant does not waive his right to a judgment of acquittal upon the ground of insufficiency of the evidence by moving for a new trial because of an improper jury instruction. See Burks v. United States, 437 U.S. 1, 17-18 (1978). Therefore, we must address these claims so as to protect the defendant from double jeopardy. If the government failed to present sufficient evidence of guilt at the first trial, it does not get a second opportunity. This is the essence of the protection afforded by the Fifth Amendment guarantee that "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." U.S. Const. Amend. V.
 
 
 9
 Our review of a claim of insufficient evidence is de novo, and the verdict "must be sustained if there is substantial evidence, taking the view most favorable to the government, to support[the finding of guilt]." Glasser v. United States, 315 U.S. 60, 80 (1942). "[T]he relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).
 
 
 10
 Count 1 alleges a conspiracy to violate the Hobbs Act. A conspiracy is an agreement between two or more people to commit an unlawful act. The basis of the crime is the agreement, and it must be proved that the defendant willfully and knowingly agreed with his coconspirators to achieve an unlawful object or to commit an unlawful act. Appellant argues that the government did not prove beyond a reasonable doubt that there was an agreement, because there was no proof that he agreed to sell for cash his vote on the pari-mutuel bill. He also claims that there was lack of proof as to the identity of coconspirators. Derrick contends that Ronald Cobb cannot be a coconspirator because of the so-called "Sears doctrine." See Sears v. United States, 343 F.2d 139, 142 (5th Cir.1965) (no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy). See also United States v. Chase, 372 F.2d 453, 459 (4th Cir.), cert denied, 387 U.S. 907 (1967) (one who acts as a government agent and enters into a purported conspiracy in the secret role of an informer cannot be a co-conspirator).
 
 
 11
 The law does not require the conspiratorial agreement to be formal or in writing; a tacit, mutual understanding between the conspirators is sufficient. United States v. Chorman, 910 F.2d 102, 109 (4th Cir.1990). The agreement may be inferred from the facts and circumstances of the case.
 
 
 12
 In attempting to make a sufficiency of the evidence argument, Derrick cannot get around his picture, his voice and his actions as reflected in the audio and video tapes that were seen and heard by the jury.
 
 
 13
 The evidence reflects that Derrick was a party to many conversations with his co-conspirators concerning the means of securing passage of the pari-mutuel bill. There were also conversations regarding his acceptance of money for his efforts to move the bill toward passage.
 
 
 14
 Among those involved in the conspiracy with Derrick were lobbyists Randy Lee and fellow house members Robert Kohn and Luther Taylor. Taylor and Kohn were paid to recruit a group of legislators to support the pari-mutuel bill and to move it to the top of the contested calendar in an effort to speed its passage. Ron Cobb was at all relevant times acting in an undercover capacity with the FBI and could not be considered as a member of the conspiracy. However, his testimony regarding the payment of $1,000 to Derrick in exchange for his support of the pari-mutuel bill was evidence of Derrick's violation of the Hobbs Act.
 
 
 15
 During April 1990, Cobb discussed the bill with appellant and as early as April 3, appellant advised Cobb that since he faced no opposition for reelection, he could take a different look at the bill. At this meeting Cobb advised Derrick that "his (Cobb's) people had the juice." Derrick responded that he "could always use a little juice." It was reasonable for the jury to equate "juice" with money in the context of the testimony. On April 17, Cobb and Derrick met again and discussed strategy to move the bill to the top of the calendar. At this meeting Cobb said he could do "something substantial" for Derrick in exchange for his help, and Derrick responded,"I am sure I can help you on procedural things." At this time, Derrick had not agreed to vote for passage of the bill, but a vote to move the bill to the top of the calendar, a procedural matter, would be helpful and was a purpose of the conspiracy.
 
 
 16
 The following day, Cobb and Randy Lee discussed how to get Derrick to assist in moving the bill. Lee stated that Derrick understood that Cobb had "the juice" and could do something for Derrick. Several days later, Cobb and Lee met again and Lee stated"Derrick wanted to know, 'Does Ron got as much money as they say he is coming up with to pay these guys on this thing?' " During this meeting, Lee called Derrick and advised him that "today would be a very advantageous day" for him to talk to Cobb about the bill, and appellant said, "Thank you very much for that information." Later the same day, Cobb and Kohn met and Cobb advised Kohn that Derrick had told him "I think I've seen the light.... Kohn talked to me." Kohn then told Cobb that he had explained to Derrick that he would receive "$500 for a walk and $1,000 for a firm commitment." A walk would mean that he would not be present or would not vote either way on the motion to move the bill to the top of the calendar and a firm commitment would mean that he would vote for the motion.
 
 
 17
 On April 25, Cobb and Derrick met and Cobb advised Derrick that he needed him, to which Derrick responded, "Either, either me voting or walking, huh?" Later that day appellant supported and voted for the procedural effort to move the bill to the top of the contested calendar. A week later Cobb and Derrick met again and appellant suggested that Cobb furnish him with some DIAWA golf clubs, expensive Japanese golf equipment. They discussed whether Cobb could get a good deal on such equipment and eventually Cobb suggested that he just pay Derrick cash. A week or so later, Kohn advised Derrick that Cobb had a package for him and told him to go to Cobb's room at the Town House Hotel and that Cobb wanted to get the bill going again the following year and would need Derrick's help. Derrick stated, "Well, I'll have another birthday next year." During this meeting, Derrick advised Kohn that he was going to list part of the cash he would receive from Cobb as an in kind contribution so that both he and Cobb were "covered." Later that day, appellant went to the Town House Hotel, met with Cobb and was paid $1,000 for his assistance with the pari-mutuel bill.
 
 
 18
 The above evidence was sufficient to prove the existence of a conspiracy involving Kohn, Taylor, Lee and Derrick to violate the Hobbs Act by seeking and receiving compensation for their support of a bill pending before the South Carolina legislature and the votes of the three representatives on the procedural motion. The evidence was also sufficient to prove that Derrick had violated the Hobbs Act by accepting $1,000 in cash for his support of a matter pending in the South Carolina legislature.
 
 III.
 
 19
 Appellant also argues that the district court lacked jurisdiction to try him because there was insufficient evidence to prove an effect upon interstate commerce, which is an essential element of a Hobbs Act prosecution. See Stirone v. United States, 361 U.S. 212, 218 (1960). The evidence presented by the government in its case-in-chief as to the impact on interstate commerce was basically the same as that presented in the prosecution of Luther Taylor, and we found in Taylor I, supra, that this was sufficient to establish the necessary nexus between the alleged extortion and interstate commerce. Nothing has been presented in the present appeal, the briefs, or arguments that would persuade us to change the holding in Taylor.
 
 
 20
 We have considered the remaining exceptions raised by the briefs and find no merit in them.
 
 
 21
 The judgments of conviction are reversed and this matter is remanded to the district court for further proceedings consistent with this opinion.
 
 
 22
 REVERSED AND REMANDED WITH INSTRUCTIONS.