46 F.3d 361
 UNITED STATES of America, Plaintiff-Appellee,
v.
Patrick Turner HAIRSTON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rodney Jerome SUMLER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Lee Faye McDonald MACK, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellant,
v.
Rodney Jerome SUMLER, Defendant-Appellee.
 Nos. 92-5597, 92-5605, 92-5606 and 92-5631.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 15, 1994.
Decided Feb. 1, 1995.
 
 ARGUED: James Richard Glover, Glover & Petersen, P.A., Chapel Hill, NC, James Elliot Ferguson, II, Ferguson, Stein, Wallas, Adkins, Gresham & Sumter, P.A., Charlotte, NC, for appellants. Douglas Cannon, Asst. U.S. Atty., Greensboro, NC, for appellee. ON BRIEF: William E. Martin, Federal Public Defender, Gregory Davis, Asst. Federal Public Defender, Greensboro, NC, for appellant Mack. Walter C. Holton, Jr., U.S. Atty., Bryan E. Gates, Third Year Law Student, Donald Ross Hamilton, Third Year Law Student, Elizabeth Ann Hamilton, Third Year Law Student, Wake Forest School of Law, Winston-Salem, NC, for appellee.
 Before ERVIN, Chief Judge, and BUTZNER and PHILLIPS, Senior Circuit Judges.
 Affirmed in part, reversed in part, vacated in part, and remanded in part by published opinion. Senior Judge BUTZNER wrote the opinion, in which Chief Judge ERVIN and Senior Judge PHILLIPS joined.
 OPINION
 BUTZNER, Senior Circuit Judge:
 
 
 1
 The principal issues are whether the evidence is sufficient to sustain the verdicts finding Patrick T. Hairston and Rodney J. Sumler guilty of extortion and whether the instruction pertaining to extortion under color of official right was reversible error. A grand jury returned a 28-count indictment against Hairston, Sumler, and Lee Faye Mack. The jury convicted both Hairston and Sumler of racketeering, RICO conspiracy, extortion, mail fraud, money laundering, violations of the Travel Act, and conspiracy to obstruct the Internal Revenue Service. The jury also convicted Sumler for filing a false income tax return, and it convicted Sumler and Mack for perjury. We affirm, vacate, reverse, and remand in part.
 
 
 2
 * The Winston-Salem, North Carolina, Board of Aldermen is composed of a mayor and eight aldermen elected from the city's eight wards. The Board is responsible for voting on zoning matters and city contracts. At the time of his election to the Board, Hairston was serving as president of the Winston-Salem chapter of the NAACP and People Are Treated Human, Inc. [PATH], a local charity he founded to address crime and drug abuse. Upon his election, he resigned from these positions.
 
 
 3
 Sumler owned a consulting firm, Associate Consultants, Inc., and both he and Mack held positions of authority in several local charities. Sumler succeeded Hairston as president of PATH and Mack served as vice president.
 
 
 4
 Sumler and Hairston were convicted of eight counts of extortion in violation of the Hobbs Act, which provides:
 
 
 5
 Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires so to do ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 
 
 6
 18 U.S.C. Sec. 1951(a). The statute defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. Sec. 1951(b)(2).
 
 
 7
 The Act proscribes two types of extortion. The first requires proof that the defendant induced payment by use of threats or fear. To prove extortion by fear of economic harm, the government must establish that the threat of such harm generated fear in the victim. The victim's state of mind is relevant, and the government may show not only what a defendant said but also what a victim believed about the situation. See United States v. Goodoak, 836 F.2d 708, 712-13 (1st Cir.1988). The threat need not be express: "[A] defendant who threatens a victim in esoteric, veiled, or elliptical language need not offer a simultaneous translation or define his terms, as long as he thinks or should think the victim understands what has been said." Goodoak, 836 F.2d at 714.
 
 
 8
 The second type of extortion involves obtaining property from another under color of official right. To prove this type of extortion the government need not show that the defendant demanded or induced payment. Evans v. United States, --- U.S. ----, ----, 112 S.Ct. 1881, 1888, 119 L.Ed.2d 57 (1992). Although the Supreme Court has not yet ruled on the question in contexts other than campaign contributions, we have stated that the government must prove a quid pro quo when it charges extortion under color of official right. United States v. Taylor, 993 F.2d 382, 385 (4th Cir.1993) (dictum). But cf. United States v. Blandford, 33 F.3d 685, 695-96 (6th Cir.1994). This requirement is not onerous. In Evans, which required proof of a quid pro quo because it involved campaign contributions, the Court held that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." --- U.S. at ----, 112 S.Ct. at 1889. Concurring, Justice Kennedy explained the meaning of quid pro quo in the context of the Hobbs Act as follows:
 
 
 9
 The requirement of a quid pro quo means that without pretense of any entitlement to the payment, a public official violates Sec. 1951 if he intends the payor to believe that absent payment the official is likely to abuse his office and his trust to the detriment and injury of the prospective payor or to give the prospective payor less favorable treatment if the quid pro quo is not satisfied. The official and the payor need not state the quid pro quo in express terms, for otherwise the law's effect could be frustrated by knowing winks and nods.
 
 
 10
 --- U.S. at ----, 112 S.Ct. at 1892. The official need not actually fulfill the quid pro quo. Evans, --- U.S. at ----, 112 S.Ct. at 1889.
 
 
 11
 Neither type of extortion requires a direct benefit to the extortionist. The "gravamen of the offense is loss to the victim." United States v. Santoni, 585 F.2d 667, 673 (4th Cir.1978) (citations and internal quotation marks omitted).
 
 
 12
 In evaluating whether there is sufficient evidence to support a conviction, "[t]he verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In this case, each count was prosecuted under the theories of extortion by fear of economic harm and extortion under color of official right.
 
 II
 
 13
 Hairston and Sumler assert that there were no express or implied threats of economic harm against the alleged victims, Idlewild Company, Larco Construction Company, or Peach State Capital Company. They also claim that the government failed to prove any quid pro quo in its effort to convict them of extortion under color of official right. They contend that the payments were used only to cultivate community support for Idlewild, Larco, and Peach State through charitable contributions and lobbying.
 
 
 14
 They also insist that because no checks were payable to Hairston they could not be convicted of extortion. Each extortion count, however, is based in part on 18 U.S.C. Sec. 2 which punishes an aider and abettor as a principal. A private person can be convicted of aiding and abetting a public official who extorts under color of official right. One who collects the extorted payments is no less guilty than the official he serves. United States v. Grande, 620 F.2d 1026, 1031-32 (4th Cir.1980).
 
 Idlewild
 
 15
 Counts 4, 5, and 7 charged Hairston and Sumler with the extortion and attempted extortion of checks from Idlewild. These checks all pertain to a loan made at the request of Hairston and Sumler to help with Hairston's taxes.
 
 
 16
 Scott Gwyn, the president of the company, testified that he had never experienced difficulty with his rezoning petitions before Hairston was elected. Shortly after Hairston took office, Sumler called Gwyn to offer his consulting services on Idlewild's rezoning petition for the North Chase Shopping Center site, which was then pending before the Board. Although Gwyn initially declined to retain Sumler, he testified that "[w]ithin 48 hours, or two business days, Mr. Sumler showed up on my doorstep again, petitioning the services of his company." When questioned about the content of this meeting with Sumler, Gwyn stated:
 
 
 17
 I again told him that I really wasn't interested in ... his services, and didn't think that the case would require it. He then mentioned that he had a personal relationship with one of the aldermen, which could either help or hinder me if we got involved in this project, and he didn't get involved in this project. I was a white man coming into a black ward, and had been a successful developer, and would need as much help as I could get.
 
 
 18
 Sumler quoted a price of $3,000 to help with the rezoning matter pending before the Board.
 
 
 19
 Hairston, Sumler, and Gwyn then met to discuss the rezoning of the North Chase property. When questioned about the substance of this meeting, Gwyn responded:
 
 
 20
 I asked Alderman Hairston how he felt about the property, and the proposed project, and he indicated that he would support it. And he indicated that because I was going to be retaining Mr. Sumler for this zoning, he wouldn't have any problem with the project, and he would support it.
 
 
 21
 Gwyn asked if Hairston would like to see a site plan or some schematic renderings of the proposed North Chase Shopping Center, but Hairston wasn't interested. Gwyn agreed to retain Sumler. In explaining his decision in court, he said: "I felt like I wouldn't get favorable zoning for the properties I owned in the Northern Ward."
 
 
 22
 Hairston, Sumler, and Gwyn met again several weeks later. Gwyn testified about the purpose of the meeting: "It had just been recently announced that PATH, Inc. was being started by Alderman Hairston, and ... they wanted me to see if I could give a donation to help start it off .... they would like to see me support [PATH] in the amount of $1,000." Gwyn ultimately agreed to donate $400 and delivered a check to Sumler payable to PATH. At trial, Gwyn explained: "I was afraid if I didn't [make the contribution], I wouldn't get [Hairston's] support--his vote on the [rezoning petition for] North Chase Shopping Center." Three days later, on Hairston's motion, the Board unanimously approved the North Chase petition.
 
 
 23
 Gwyn testified that two months later Hairston and Sumler congratulated him on the successful rezoning of his property and "indicate[d] that they, again, need[ed] a contribution to [PATH]." After Hairston left, Sumler requested a $1,000 donation. Gwyn elaborated on this request as follows:
 
 
 24
 I indicated I did not think that I could do $1,000 to contribute to that organization. I would like to give around four or five hundred again, which was the same amount that I had participated with earlier. Mr. Sumler indicated that, "We really need you to contribute at the level we requested."
 
 
 25
 I agreed to participate at the $1,000 level, which they requested.
 
 
 26
 Gwyn added: "I felt I had to."
 
 
 27
 Two days later, the Board rezoned another Idlewild property. Gwyn subsequently found it necessary to seek a clarification of this rezoning. At the next Board meeting, Hairston moved to make the requested clarification, and the motion passed.
 
 
 28
 Gwyn testified that Hairston and Sumler unexpectedly visited him at his office two days later:
 
 
 29
 After we got through our greetings, the reason for them coming by, Mr. Sumler indicated that Mr. Hairston had tax problems associated with his cleaning business; they were associated with the withholding tax, I believe, for employees.
 
 
 30
 * * * * * *
 
 
 31
 Mr. Hairston was wondering if he could get a loan for $5,000 to help him out of the problem that he was having with the Internal Revenue Service.
 
 
 32
 * * * * * *
 
 
 33
 I could not give them the $5,000 all at once; I could give them $2,500. They indicated--Well, Mr. Sumler said he would like to have it through his company, to give it to Mr. Hairston. And Mr. Hairston agreed to that.
 
 
 34
 * * * * * *
 
 
 35
 He indicated that--Mr. Hairston indicated that he did not think it would be proper for a loan to be generated to him from a developer.
 
 
 36
 Gwyn issued two checks to Sumler, each for $2,500. Gwyn explained: "The reason I loaned money to him was because he was an alderman in that ward, and I needed his support if--I felt like I had to." Sumler promptly cashed one check (count 4). That same day, Hairston deposited $1,200 in cash into his savings account. One week later, Sumler cashed the second check (count 5). The following day, Hairston deposited a total of $1,250 in cash into his savings and checking accounts. Both Idlewild checks were subsequently returned for insufficient funds, but Sumler later redeposited them and they cleared. Sumler called Gwyn and asked for two more checks to cover the checks that had been returned (count 7). Sumler cashed the first of these replacement checks and deposited the second into his business account. Gwyn testified that Sumler received a total of $10,000 from Idlewild. Hairston refused to give the note that he had promised, but he made partial repayment of $1,875.
 
 
 37
 Two significant episodes occurred before Gwyn lent this money. First, seeking a retainer fee, Sumler told Gwyn that Hairston could either help or hinder Idlewild's zoning requests. Second, Hairston confirmed that retaining Sumler for the pending zoning would gain Hairston's support.
 
 
 38
 It is against this background that the jury was entitled to view the loan. Although Idlewild had no zoning petition pending, it owned property in Hairston's ward and would need support for its rezoning. Gwyn believed that because Hairston was an alderman, he needed Hairston's support. He believed that to keep this support he "had to" lend the money. Gwyn's belief was engendered by Sumler's threat to "help or hinder" and by Hairston's willingness to support Idlewild's zoning because Gwyn had retained Sumler's firm. The evidence proved extortion both by threat of economic harm and under color of official right. The quid pro quo was the payment of money in return for favorable rezoning votes.
 
 
 39
 Hairston and Sumler protest that counts 4, 5, and 7 constitute at best a single offense. The government concedes that counts 4 and 5 should be merged.
 
 
 40
 We find merit in the defendants' position. All three counts involved only one wrongful demand for a single loan. The second $5,000 charged in count 7 was induced by the representation that the checks given for the first $5,000 were worthless. But the demand for the second $5,000 was nevertheless for the same act of extortion--a single $5,000 loan. The payments constituted a single act of extortion. See United States v. Eaves, 877 F.2d 943, 947 (11th Cir.1989). Consequently, we vacate the convictions on counts 5 and 7. The evidence is sufficient to sustain the verdict of guilty on count 4.
 
 Larco
 
 41
 Count 3 charged that Hairston and Sumler extorted and attempted to extort $7,000 from Larco. Count 8 charged that Hairston and Sumler extorted $1,400 from Larco.
 
 
 42
 Larco was awarded a contract to resurface streets in Winston-Salem. The contract contained a provision requiring Larco to subcontract 12% of the work to a minority business. A controversy arose over Larco's failure to comply fully with this provision. There was a possibility that the Board would penalize Larco.
 
 
 43
 Just before the Board's meeting, Sumler visited William G. Smith, the president of the company. In describing this meeting, Smith testified:
 
 
 44
 [Sumler] came in and introduced himself. And he said he saw that I had a minority relations problem in the Winston-Salem area. He said that he was a public relations consultant, and he could make my problems go away. He showed me a card that he was vice-president of the NAACP, that he was the president of Associate Consultants, and another card that said he was involved in PATH, Incorporated. He mentioned that Mr. Hairston was also involved with PATH.
 
 
 45
 * * * * * *
 
 
 46
 [H]e said that what he could do is understand our side of the story and communicate that to the black leaders in the community, and black grass roots leaders in the community, especially to the people on the Board of Aldermen.
 
 
 47
 * * * * * *
 
 
 48
 He said that his services would be $1,500 a month; that I would need to sign a one-year contract with him, and have to come up with some budgets to donate to various charities, and things that people were--black leaders were interested in, in the community.
 
 
 49
 When Smith pressed Sumler for proof of his influence, Sumler immediately called Hairston and arranged for Hairston and Smith to meet at Hairston's home that night.
 
 
 50
 In describing the meeting with Hairston, Smith explained:
 
 
 51
 Hairston indicated to me that he understood what I had done, and he more fully appreciated Larco's position in the matter, and that he would probably vote with us. I asked him further, since he was on the Board of Aldermen, and since he was the only black person on the Board of Aldermen that I had talked to, that if he could communicate our story to some of the others, and he said he would.
 
 
 52
 Smith testified that he received a call from Sumler the next morning and that he told Sumler he could not afford his consulting services. Three days later, Hairston voted to impose a penalty against Larco.
 
 
 53
 As a result of Hairston's vote to penalize Larco, Smith became concerned that Sumler and Hairston were trying to extort money from him. He explained his situation to the FBI and allowed the FBI to tape his subsequent meetings. At their next meeting, Sumler and Smith discussed the penalty. Sumler began by suggesting that Larco give $10,000 to Associate Consultants for distribution to black organizations as a means of building support for Larco. The following conversation ensued (ellipses represent pauses in the transcribed conversation):
 
 
 54
 Smith: I'll tell you, [Sumler], we can't afford to pay this.
 
 
 55
 Sumler: Well, I'm not saying ... You might not be able to afford that much but it's gonna take you giving us ... You gotta spend five or six thousand dollars or something. Or if you look at the kinda money that you ... that you stand to lose when they fight you. And you've made a legitimate bid on ... on ... on something. You got some profit built in and you have to determine, uh, how much of your profit you're gonna cut into to get people off your back.
 
 
 56
 In particular, Sumler requested $7,000, of which $1,000 would be the first month's retainer for Associate Consultants and the remaining $6,000 would be divided in specified amounts among named charities. After making this request for $7,000, Sumler explained why Hairston's support had disappeared at the previous board meeting:
 
 
 57
 [Hairston] didn't vote against you. He compromised and went along with them deciding they were gonna penalize you halfway. And if you had hired us, uh, I would of argued the position with him that he had made a commitment. Now he called ... I told him exactly what you said.
 
 
 58
 * * * * * *
 
 
 59
 Alright, look you ... you ... For one thing you didn't do what you told me you were gonna do with me. You told me now said, "Now you ... if you get that meeting, I'll do certain things with you. If you just show me you could do that." And then, you know, you didn't follow back and ... and, uh, you didn't ... you didn't ... you didn't even offer me an ad [for my newspaper].
 
 
 60
 I did not kill that deal with [Hairston] which you know. I didn't say anything. I just ... All I said to him, "Well, I want you to meet with this man because I'm ... I'm working on trying to get ... set a retainer with him and I think he's being treated unfairly on it and I want you to listen to him." I ... And ... and I did for you what you asked me to do.
 
 
 61
 Sumler and Smith met again the following day, and Sumler elaborated further on the vote by the Board:
 
 
 62
 Pat Hairston is pro-business and the last time he was not against you, you just didn't follow through on ... on some things that he thought you were gonna do ...
 
 
 63
 * * * * * *
 
 
 64
 I had given him the impression that you were gonna retain us then to do some community relation stuff for you, and at that time all we wanted was just a retainer. Uh ... just to go out there an ... an ... and present your story, uh ... and at that time it would have been no money involved but that.
 
 
 65
 He thought you were gonna do that because Hairston has recommended to some developers and to some people you oughta hire this consultant firm because I have seen how they can turn a community around and get support for something, and that makes me feel comfortable because if the voters are for it, I've gotta be for it if ... if they are constituents.
 
 
 66
 Smith: So he ... he ... Hairston then expected me to hire you as a consultant?
 
 
 67
 Sumler: He thought you were gonna hire me ...
 
 
 68
 Smith: ... and when I didn't that's when he went along with that ...
 
 
 69
 Sumler: Well, wh ... when you didn't, I didn't say anything else to him, I didn't go down there and say anything else to him. I set that meeting up and he, uh, he inquired with me later to find out well, uh, uh, is Larco gonna hire you?
 
 
 70
 I said, "Well, no. He said he really doesn't have the funds right now."
 
 
 71
 Smith agreed to meet Sumler and Hairston for breakfast the following morning and to pay Sumler the $7,000. Smith issued a company check to Associate Consultants in the amount of $7,000. Smith testified that, by arrangement, he passed this check to Sumler in the parking lot of the restaurant because Sumler "didn't want any money to be given to him in front of Mr. Hairston."
 
 
 72
 Sumler cashed the check, and Hairston deposited $1,000 in cash into his account the same day. Three days later, the Board awarded Larco a paving contract; Hairston voted in favor of Larco.
 
 
 73
 At their meeting Sumler told Smith that the Winston-Salem NAACP, Liberty East Redevelopment, and Top Ladies of Distinction would each receive $1,000 contributions out of the money provided by Larco. Sumler confirmed by letter that these donations had been made. Officials of each organization testified, however, that the contributions were not made.
 
 
 74
 Hairston voted, along with a majority of the Board, to award Larco another resurfacing contract. The next day, Sumler sent a letter to Smith requesting $4,174. Smith testified that Sumler said "there was going to be a Congressional Black Caucus in Washington, D.C., at the Washington Hilton, and he was writing to give me a budget to take local, elected officials and himself to Washington, to this meeting." Sumler identified Hairston as one of the officials covered by the budget, and Smith agreed to pay the expenses of one person. A meeting between Hairston, Sumler and Smith was held at Hairston's home, and Smith brought with him a check made payable to Hairston for $1,400. Smith testified that Hairston would not accept the check payable to him but insisted that the money be given to Sumler instead. On cross-examination, Sumler admitted that he did not use the $1,400 to pay the expenses of officials to attend the black caucus meeting. Instead, Sumler testified that he intended all along "to use those funds to lobby and to entertain."
 
 
 75
 The evidence and reasonable inferences disclose that when Larco declined to retain Sumler, Hairston voted against Larco. When Larco retained Sumler and made other payments to Sumler, Hairston voted in favor of Larco. The record is sufficient to prove that Sumler and Hairston induced Larco to pay under threat of economic harm. The record also establishes extortion by Hairston, aided and abetted by Sumler, under color of official right. The government proved the element of quid pro quo, payments in return for favorable votes on Larco's construction bids. The evidence is sufficient to sustain the verdicts on counts 3 and 8.
 
 Peach State
 
 76
 After Smith reported his dealings with Hairston and Sumler, the FBI began an investigation led by agent George Murray who posed as an Atlanta businessman named George Miller representing Peach State. Count 12 charged that Hairston and Sumler demanded $20,000 from Miller. Count 13 charged the extortion of $2,000, which the evidence disclosed was a payment in response to the demand for $20,000. Count 15 charged the extortion from Peach State Capital of $1,000.
 
 
 77
 Miller contacted Hairston, said that Peach State wished to relocate to Winston-Salem, and arranged to meet Hairston there. At the meeting, Miller told Hairston that his company had some problems with radioactive waste. Hairston thereupon recommended Sumler and arranged for Sumler to contact Miller.
 
 
 78
 After returning to Atlanta, Miller received a call from Sumler, and they agreed to meet in Winston-Salem. At that meeting, Sumler requested a retainer of $7,000, plus $1,000 weekly. He also wanted contributions for five charities, including $10,000 for PATH and $6,000 for the NAACP Youth. Sumler reiterated the demand in a memorandum to Miller. Miller testified that Sumler portrayed these contributions as the way to gain favor with the aldermen:
 
 
 79
 [Donations] would give me an advantage with the Board of Aldermen, specifically Alderman Hairston; and that it would be to my advantage because I detailed to [Sumler] that any time we had a problem, it was going to be before the Board of Aldermen, and I did not want to get shut out. We were in a profit situation, we needed to win any type of material or issues we had before the Board of Aldermen, and [Sumler] explained to me this was the way that it would put me in a win situation.
 
 
 80
 Hairston and Sumler later met with Miller and other undercover FBI agents in Winston-Salem. At this meeting, Miller gave Sumler a check for $2,000 for the NAACP Youth. When Miller sought assurance that the donations would pay off, Sumler responded:
 
 
 81
 [A]s a Consultant or a Lobbyist, I studied Alderman Hairston and what they do because that's the way I get paid, trying to know what they do so that I can influence how they might do it. From that point of view, I would like to say to you in his presence. Some things, is not expedient for him to just come out and say to you as an elected official, so I don't want you to get the impression that he might not be coming across as strongly as you want to hear him come across.
 
 
 82
 * * * * * *
 
 
 83
 [I]n other words, representing you, I can communicate with him on a different level then [sic] the law would allow him to discuss right here some of these things we're talking about. And I think that's why he had recommended to Mr. Miller that you all obtain [sic] my company to carry on that kind of go between situation where I'm representing your company and I'm also negotiation [sic] from a position of strength....
 
 
 84
 * * * * * *
 
 
 85
 I can assure you the plan that we used, he's been a part of it working and a key part in the past and I think he must feel comfortable with our approach unless [sic] he wouldn't recommend us to Mr. Miller. But I did want to point out that even here in his presence that he might not say something, because it's really not expedient for him to say--no, he shouldn't tell you point blank that I'm gonna guarantee this will happen but we can see--I can say that, you know, because I've seen how the system works.
 
 
 86
 Two days after this meeting, Hairston called Miller (ellipses represent pauses in the transcribed conversation):
 
 
 87
 Hairston: Well, what I ... I, I had called you. I wanted to get to see you, uh, before that with an idea that came up, I just thought it would be good PR.
 
 
 88
 Miller: Okay.
 
 
 89
 Hairston: Uh, ... you know, the fight Monday night [between Tyson and Spinks]?
 
 
 90
 Miller: Yes.
 
 
 91
 Hairston: And we have a board meeting Monday night and, uh, I thought that if, uh, you know, you could, uh, send some of the male, board members to the fight, some of the women probably wouldn't wanta go, and some of their friends. They're hoping that, uh, [Sumler] could invite.
 
 
 92
 Miller: Uh huh.
 
 
 93
 Hairston: Would might be good. You know, it might be good for 'em and then, so we could all ... We usually sit down somewhere and eat some sandwiches, but if we sit down and get to drinking beer or somethin' after, at the fight it, while the fight's going on, we could slip things in on 'em and ... (both laugh). You know?
 
 
 94
 Miller: Okay.
 
 
 95
 Hairston: Yeah.
 
 
 96
 * * * * * *
 
 
 97
 Miller: So you feel like [the money for the fight would] be a good investment for us?
 
 
 98
 Hairston: Yeah. I think it'd be a good investment. You probably, uh, I don't know ... about a thousand dollars 'cause they're gonna be drinking and all. And there's eight Alderman and if they bring a friend or something. They ... But all of 'em ain't going come. But the men will probably wanta bring a friend or something. So, you know, you need about two tables. About, I guess about a thousand dollars oughta do it or a little less or more.
 
 
 99
 Miller: Okay. About a thousand dollars?
 
 
 100
 Hairston: Yeah.
 
 
 101
 Miller: Okay. And, uh, who should I send the check ...
 
 
 102
 Hairston: You send it to [Sumler].
 
 
 103
 Miller: Okay.
 
 
 104
 Hairston: It's gonna come through him, cause I can't do it, you know.
 
 
 105
 * * * * * *
 
 
 106
 Miller: And it will pay off for me in the future.
 
 
 107
 Hairston: Okay.
 
 
 108
 Miller: All right. I'm, uh, only, uh, the only question Mister Lee had yesterday when I was talking with him, well, actually this morning, I talked with him, uh, was some questions about the amount of money we were paying [Sumler] he, uh, had some reservations about whether [Sumler] of course, uh, is, uh, closely aligned with, uh, you and the, uh [Alderman] Womble, uh, but he had some questions about whether he could bring across the other Alderman.
 
 
 109
 Hairston: Well, he might not be, [Sumler] cannot bring across the other Alderman. He, he probably don't need to bring across the other Alderman. I, I, that's the role that I think that I will play.
 
 
 110
 During the telephone conversation Hairston explained that Sumler's job is "to provide you with community support." The conversation continued:Hairston: My job is not that. My job is if I have the final say. The vote. That's, that's, that's the final say, the vote.
 
 
 111
 Miller: Yes, sir.
 
 
 112
 Hairston: If we say we don't want it then that's the way it go, but if we say we want it then that's the way it go.
 
 
 113
 Miller: That's right. And if those charities are taken care of, it's gonna go our way. (laughs)
 
 
 114
 Hairston: That's right. That's they way I see it. I don't see it any other way.
 
 
 115
 Miller testified that he called Sumler the following day, discussed his conversation with Hairston, and wire-transferred the money to Sumler for the fight (count 15).
 
 
 116
 Again, an analysis of the evidence shows that Hairston--aided and abetted by Sumler--induced payments from Peach State by threat of withholding favorable votes, creating economic harm if Peach State did not pay. The evidence also discloses Hairston's extortion under color of official right. The quid pro quo was payment in return for votes in favor of Peach State's project.
 
 
 117
 Because the demand for $20,000 (count 12) and the payment of $2,000 in response (count 13) pertain to the same wrongful demand, we vacate the conviction on count 13. See Eaves, 877 F.2d at 946-47. The evidence is sufficient to sustain the verdicts on counts 12 and 15.
 
 III
 
 118
 Hairston and Sumler claim that they are entitled to a new trial because, in their view, the district court did not instruct the jury that a quid pro quo is an essential element of extortion under official color of right. In particular they object to a clause which they have underlined in their brief. The instruction and the defendants' emphasis are as follows:
 
 
 119
 The term "under color of official right" is the wrongful taking by a public officer of money or property not due to his office, whether or not the taking was accomplished by force, threats, or use of fear. In other words, while the mere acceptance of voluntary contributions by public officials is not extortion under color of official right, the wrongful use of otherwise valid official power may convert lawful action into unlawful extortion. So, if a public official accepts things of significant value to which he was not entitled, and which he knows were given to him with the expectation of influencing his conduct of his public office, such action would constitute extortion.
 
 
 120
 The government maintains that the instruction passes muster under recent case law. It contends that the instruction read as a whole sufficiently conveys the necessity of a quid pro quo.
 
 
 121
 The chronology of the case law is helpful in understanding the context in which this issue arose. The Supreme Court held in McCormick v. United States, 500 U.S. 257, 273-74, 111 S.Ct. 1807, 1817, 114 L.Ed.2d 307 (1991), that in prosecutions involving campaign contributions to a public official the government must prove a quid pro quo. Subsequently, we held in United States v. Torcasio, 959 F.2d 503, 506 (4th Cir.1992), that McCormick applied only to cases involving campaign contributions. The instruction was correct under the law of this circuit as explained in Torcasio.
 
 
 122
 A few months after the district court entered its judgments, the Supreme Court decided Evans. Although considering another campaign contribution case, the Court wrote broadly enough to require proof of a quid pro quo in all cases charging extortion under color of official right. Evans, --- U.S. at ---- - ----, 112 S.Ct. at 1888-90. This prompted Justice Kennedy to state that the rationale of the Court's opinion applied not only to campaign contributions but also to other prosecutions for violation of Sec. 1951. Evans, --- U.S. at ----, 112 S.Ct. at 1894 (concurring opinion). In Taylor, we expressed the view that Evans required proof of a quid pro quo in all prosecutions charging extortion under color of official right. 993 F.2d at 384-85 (dictum).
 
 
 123
 Against this background it is understandable that the district court's instruction is not as precise as it would have been had the district court had the benefit of Evans and Taylor. Nevertheless, it is well established that the instruction must be read "in the context of the instructions as a whole and the trial record." Estelle v. McGuire, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991). Although the district court's instruction is not a model for future cases, it adequately conveyed the necessity of proof of a quid pro quo when it is read according to the precept McGuire reiterated.
 
 
 124
 The instruction advised that under color of official right the extortion need not be engendered by fear. As the district court explained, the public official's acceptance of money must be "wrongful" and "not due to his office." It went on to say that a public official's acceptance of "voluntary contributions" is not extortion.
 
 
 125
 To distinguish innocent acceptance of money from extortion, the district court instructed that "the wrongful use of otherwise valid official power may convert lawful action into unlawful extortion." The final clause of the instruction, to which the defendants assign error, must be read in the context of the language that preceded it. Read as a whole, the instruction satisfies the requirement of quid pro quo set forth in Evans as follows: "[T]he Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." --- U.S. at ----, 112 S.Ct. at 1889.
 
 
 126
 Although we have concluded that the district court's instruction was not erroneous, we consider alternatively whether this omission, even if viewed as error, would be harmless. See Fed.R.Crim.P. 52(a). The Supreme Court has created two categories of constitutional violations that may occur during the course of a criminal trial--trial errors which are subject to harmless error analysis and structural defects which are per se cause for reversal. Arizona v. Fulminante, 499 U.S. 279, 307-12, 111 S.Ct. 1246, 1263-66, 113 L.Ed.2d 302 (1991); Brecht v. Abrahamson, --- U.S. ----, ----, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993). Trial error has been described as "error which occurred during the presentation of the case to the jury." Fulminante, 499 U.S. at 307, 111 S.Ct. at 1263. In delineating the two types of constitutional violations, the Supreme Court has placed misstatements of an element of the offense in the category of trial error. Fulminante, 499 U.S. at 306-07, 111 S.Ct. at 1263.
 
 
 127
 Review under harmless error analysis is a fact specific inquiry. United States v. Mason, 993 F.2d 406, 409 (4th Cir.1993). The Supreme Court has emphasized that this inquiry must examine the jury's resolution of the relevant issues and ascertain whether it would have remained the same if the court had given a proper instruction on those issues. See generally Pope v. Illinois, 481 U.S. 497, 503, 107 S.Ct. 1918, 1922, 95 L.Ed.2d 439 (1987); Rose v. Clark, 478 U.S. 570, 580-82, 106 S.Ct. 3101, 3107-08, 92 L.Ed.2d 460 (1986). It must be remembered that jurors do not parse "instructions for subtle shades of meaning in the same way that lawyers might." Boyde v. California, 494 U.S. 370, 380-81, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990). Instead, jurors will view the instructions contextually and arrive at a "commonsense understanding of the instructions in the light of all that has taken place at trial." Boyde, 494 U.S. at 381, 110 S.Ct. at 1198.
 
 
 128
 The district court directed the jury's attention to the pertinent issue of wrongful use of official power. As we have shown in part II, with respect to each extortion, the litigants focused precisely upon the establishment of the required quid pro quo. The evidence showed that the extortion under color of official right from Idlewild, Larco, and Peach State involved payments, to which Hairston was not entitled, given in return for Hairston's favorable votes and that Hairston knew of this corrupt purpose. We can confidently conclude that the omission of a specific instruction on quid pro quo was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).
 
 
 129
 Our conclusion is buttressed by the instruction pertaining to Hairston's and Sumler's use of a facility of interstate commerce to promote an unlawful activity as charged in counts 22, 23, and 24. The district court directed the jury's attention to the charge of bribery mentioned in these counts. The court's explanation of bribery included the concept of quid pro quo. The jury convicted Hairston and Sumler on these counts. The evidence pertaining to bribery was the same evidence pertaining to extortion under color of official right. Clearly the jury comprehended the parties' understanding about the corrupt nature of their transactions.
 
 IV
 
 130
 Hairston and Sumler were convicted on count 27 of violating 18 U.S.C. Sec. 371 for conspiring to defraud the United States in its determination and collection of income tax revenue. The indictment alleged that they conspired to solicit charitable donations, cash the contribution checks, and convert the cash for their own personal use. Sumler and Hairston contend that the evidence was insufficient to support the verdict. They direct their arguments to the narrow issue of whether there was an agreed upon objective to obstruct the IRS's tax collection efforts.
 
 
 131
 To convict, the government must prove that "an agreed upon objective of the criminal conspiracy [was] to thwart the IRS's efforts to determine and collect income taxes." United States v. Vogt, 910 F.2d 1184, 1202 (4th Cir.1990). A conviction under Sec. 371 will not stand where "impeding the IRS [was] only a collateral effect" of the conspiracy. Vogt, 910 F.2d at 1202.
 
 
 132
 Viewed in the light most favorable to the government, the evidence indicated that Sumler and Hairston agreed to convert their illegally acquired checks into cash in order to avoid reporting the income to the IRS. For example, when Hairston and Sumler extorted a "loan" for Hairston from Gwyn, they directed him to make the checks payable to Associate Consultants rather than payable directly to Hairston (count 4). Upon receipt Sumler cashed the checks, and they divided the proceeds.
 
 
 133
 The $7,000 check extorted from Larco repeats this pattern (count 3). Smith delivered the check to Sumler who cashed it. That same day, Hairston deposited $1,000 in cash into his personal savings account.
 
 
 134
 Hairston did not report income from these extortion schemes on his income tax returns. Sumler did not file any personal or corporate tax returns during the relevant period. The jury could conclude that Hairston and Sumler funneled the extortion money through Sumler's corporation and converted it into cash in order to impede the ability of the IRS to ascertain their illicit income.
 
 V
 
 135
 Hairston and Sumler were convicted of money laundering on counts 19, 20, and 21. 18 U.S.C. Sec. 1956(a)(1)(B)(i). See United States v. Heaps, 39 F.3d 479, 483 (4th Cir.1994) (discussing the elements of money laundering). Hairston and Sumler assert that the evidence is insufficient to prove the design element of money laundering--that is, they knew the financial transaction was designed, either in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified illegal acts. See Heaps, 39 F.3d at 483.
 
 
 136
 Each count was based on evidence that a check, representing the proceeds of either extortion or mail fraud, was cashed in order to disguise the nature, location, source, ownership, or control of the proceeds. The convictions on counts 19 and 20 are extortion based and relate to the $5,000 loan that Gwyn made to Hairston. The conviction on count 21 stems from R. E. Shelton's $5,000 charitable contribution payable to PATH procured through mail fraud. Sumler subsequently endorsed and cashed that check.
 
 
 137
 As to the design element, we have observed that the government must "prove a specific intent to structure a transaction so as to conceal the true nature of the proceeds." United States v. Gilliam, 975 F.2d 1050, 1056 (4th Cir.1992). In evaluating Sumler's intent, his general practice of cashing checks must be considered. The evidence disclosed that Hairston and Sumler extorted and defrauded corporations and individuals out of money that was ostensibly to be used for charitable and lobbying purposes. Both Hairston and Sumler insisted that all checks be delivered to Sumler and made payable either to Sumler's consulting company or to charities controlled by him. The evidence demonstrated that the checks were not used for their stated purposes. Instead, Sumler cashed the illegally obtained checks and in some instances divided the proceeds with Hairston.
 
 
 138
 The use of the charities and the consulting company allowed Hairston and Sumler to cloak their activities with a semblance of legitimacy. Cashing checks does not in itself prove the design element of money laundering. Nevertheless, under the facts of this case the jury was entitled to determine that the financial transaction of negotiating the checks for cash was an integral step in Hairston's and Sumler's plan to convert charitable donations and lobbying expenses into personal income. From all of the evidence, viewed in a light most favorable to the government, the jury could conclude beyond a reasonable doubt that Sumler and Hairston had the requisite knowledge and intent to be found guilty of laundering the checks they received through extortion and mail fraud.
 
 VI
 
 139
 Count 26 charged that Lee Faye Mack, director of the Back to Life Center, committed perjury in her testimony before the grand jury. The same count charged Sumler with inducing and procuring Mack's perjury. They contend that the evidence is insufficient to sustain the jury's verdicts of guilt.
 
 
 140
 In relevant part, 18 U.S.C. Sec. 1623(a) provides that "[w]hoever under oath ... in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration" shall be guilty of perjury. "Precise questioning is imperative as a predicate for the offense of perjury." Bronston v. United States, 409 U.S. 352, 362, 93 S.Ct. 595, 602, 34 L.Ed.2d 568 (1973) (interpreting 18 U.S.C. Sec. 1621); see also United States v. Earp, 812 F.2d 917, 919 (4th Cir.1987) (applying Bronston to Sec. 1623). A perjury conviction cannot be based upon evasive answers or even upon misleading answers so long as they are literally true. In the face of evasion or misleading answers, it is the lawyer's duty "to bring the witness back to the mark, to flush out the whole truth with the tools of adversary examination." Bronston, 409 U.S. at 358-59, 93 S.Ct. at 600.
 
 
 141
 In investigating whether Sumler delivered the contributions he received for charities, the government issued a subpoena to Mack for the donation records of the Back to Life Center. In response, Mack turned over typed documents, including one titled "Contribution to the Back to Life Center 1988-1989." The government contended that Sumler provided information that was the basis of a part of this typed document. Mack was subsequently called to testify before the grand jury about these contributions. She was indicted and convicted for perjury based on the following declarations made before the grand jury.
 
 
 142
 Q: Do you know who prepared [Government's Exhibit 3 titled "Contribution to the Back to Life Center 1988-1989"]?
 
 
 143
 A: Uh, I helped to prepare it; because, I was the one that got this.
 
 
 144
 Q: Who else helped prepare this?
 
 
 145
 A: My secretary did.
 
 
 146
 Q: And, what's her name?
 
 
 147
 A: Belita Martin.
 
 
 148
 Q: Who else helped you prepare it?
 
 
 149
 A: Preston Mack.
 
 
 150
 Q: And, who else helped you prepare it?
 
 
 151
 A: I can't tell you anybody else, sir, because that's who work out of Back to Life. Q: You three are the only people you can recall who helped prepare this document?
 
 
 152
 A: We prepared that at the center; and, we did send the same copy that you brought to me, we sent it to Mr. Sumler.
 
 
 153
 * * * * * *
 
 
 154
 Q: Didn't you just tell the ladies and gentlemen of the Grand Jury that Government's Exhibit 3 was prepared by you, Mr. Mack, and Ms. Martin?
 
 
 155
 A: I said no. I said I've seen it, but I didn't do it.
 
 
 156
 Q: So, you did not help prepare this?
 
 
 157
 A: I've seen it. I looked over it.
 
 
 158
 Q: Who prepared Government's Exhibit 3?
 
 
 159
 A: Belita Martin and Preston Mack.
 
 
 160
 * * * * * *Q: Now, did Rodney Sumler prepare Government's Exhibit 3?
 
 
 161
 A: No, he didn't.
 
 
 162
 Q: He had nothing to do with the preparation of Government Exhibit 3?
 
 
 163
 A: Not to my knowledge.
 
 
 164
 The term "prepare" is susceptible of several meanings in common parlance. It may mean to "make ready beforehand for some purpose: [to] put into condition for a particular use, application, or disposition." The term may also be used to mean "draw up" or "put into written form." The term "preparation" has essentially the same meanings. Webster's Third New International Dictionary 1789-90 (3d ed.1986). The prosecutor apparently had in mind the former definition. From the context of Mack's testimony, it is obvious that she used the term in a manner consistent with the latter definition. Instead of simply asking if Sumler had anything to do with the document, the prosecutor persisted in his use of the terms "prepare" and "preparation." We reverse the conviction of Mack for perjury because the prosecutor did not use the requisite specificity in questioning, despite Mack's apparent confusion or evasion.
 
 
 165
 Sumler was also convicted for subornation of the statements made by Mack before the grand jury. Because proof of actual perjury is a necessary element of subornation, Sumler's conviction for subornation of perjury must be reversed along with Mack's conviction for perjury. Petite v. United States, 262 F.2d 788, 794 (4th Cir.1959), vacated on other grounds, 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960).
 
 VII
 
 166
 Hairston and Sumler assign several other errors. After consideration of the record, briefs, and oral argument, we conclude that their contentions do not require extensive discussion.
 
 
 167
 The defendants argued broadly that their convictions for RICO, RICO conspiracy, mail fraud, conspiracy to obstruct the Internal Revenue Service, violations of the Travel Act, and money laundering must be reversed because they are predicated on faulty extortion convictions. This argument fails because we have affirmed the convictions for extortion.
 
 
 168
 The district court did not err by rejecting the defendants' proposed mail fraud instruction for counts 16-18. When the charge is read as a whole, and not in isolation, it is clear that the trial judge properly instructed the jury. See McGuire, 502 U.S. at 72-73, 112 S.Ct. at 482.
 
 
 169
 Without objection the district court bifurcated the trial by separately submitting counts 25 and 26 against Sumler and Mack to the jury. They were acquitted on count 25, and we have reversed their conviction on count 26. With respect to these counts their claim of a Sixth Amendment violation is moot. The second part of the trial also included count 28 charging Sumler with understating his income for tax purposes. We consider this issue under the standard of plain error. The district court fully explained to the parties its reasons for bifurcating the trial. It acted well within its discretion. See United States v. King, 582 F.2d 888, 890 (4th Cir.1978).
 
 VIII
 
 170
 The final issue is the government's contention that the trial court erred by not imposing a fine on Sumler under the Sentencing Guidelines. Guideline Sec. 5.E1.2(a) states, "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The defendant bears the burden of demonstrating his present and prospective inability to pay. See United States v. Blanchard, 9 F.3d 22, 26 (6th Cir.1993).
 
 
 171
 The district court did not impose a fine on Sumler for the following reason:
 
 
 172
 The Court is unable to determine the financial condition of Mr. Sumler. The Court cannot help but feel that if it's adequately straightened out to understand the financial condition of Mr. Sumler, that a fine would be appropriate. However, in view of the fact that no definite proof can be made of Mr. Sumler's equity in any properties that he owns at this point, the Court declines to impose a fine for the reason that it would be a useless venture.
 
 
 173
 The defendant cannot meet his burden of proof by simply frustrating the court's ability to assess his financial condition. The district court must determine whether the defendant has proved his present and prospective inability to pay a fine. We remand for reconsideration of this issue.
 
 IX
 
 174
 Counts 1-4, 8, 12, 15-24, 27, and 28 are affirmed. Count 26 is reversed. Counts 5, 7, and 13 are vacated. The case is remanded for consideration of Sumler's ability to pay a fine and for resentencing of Hairston and Sumler because several counts have been either reversed or vacated.
 
 
 175
 AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART AND REMANDED FOR FURTHER CONSIDERATION.