**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                          No. 94-6690

WILLIAM T. ELLIS,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
John T. Copenhaver, Jr., District Judge.
(CR-89-242, CA-93-709)

Argued: February 1, 1996

Decided: July 16, 1996

Before NIEMEYER and MICHAEL, Circuit Judges, and
PHILLIPS, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Jacqueline Gerson, SIDLEY & AUSTIN, Washington,
D.C., for Appellant. Michael Lee Keller, Assistant United States
Attorney, Charleston, West Virginia, for Appellee. **ON BRIEF:** Car-
ter G. Phillips, SIDLEY & AUSTIN, Washington, D.C.; R. Clarke
VanDervort, ROBINSON & MCELWEE, Charleston, West Virginia,
for Appellant. Rebecca A. Betts, United States Attorney, Charleston,
West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

William T. Ellis appeals from the district court's order denying his motion to vacate, set aside, or correct sentence by a person in federal custody pursuant to 28 U.S.C. § 2255. Ellis raises two main issues on appeal. He argues that the district court erred when it refused to vacate and set aside his convictions for violating the Hobbs Act and the federal racketeering statute because his jury was not instructed that a quid pro quo is a necessary element of the federal extortion crimes charged under the Hobbs Act and under RICO as predicate acts. At the time of Ellis's trial in 1990, a quid pro quo instruction was not required under the Hobbs Act. It now is. See McCormick v. United States, 500 U.S. 257 (1991); Evans v. United States, 504 U.S. 255 (1992). The district court held, however, that Ellis had failed to show "cause" and "prejudice" for his failure to raise this issue on direct appeal. See Frady v. United States, 456 U.S. 152 (1982).

Ellis also argues that the district court erred when it held that sufficient evidence was presented at trial showing that he obstructed justice in violation of 18 U.S.C. § 1503. Ellis contends that his obstruction of justice conviction cannot stand after the Supreme Court's recent decision in United States v. Aguilar, 115 S. Ct. 2357 (1995). In Aguilar the Supreme Court held that a nexus must be shown between the alleged act of obstruction and the investigation alleged to have been obstructed. Id. at 2362. According to Ellis, no temporal nexus exists here and, therefore, insufficient evidence of guilt was presented at trial.

As we explain, Ellis suffered no prejudice from the omission of the quid pro quo instruction on the Hobbs Act charge because the trial court's other instructions to the jury adequately covered the point. We do not, therefore, address the issue of cause. On Ellis's conviction for obstruction of justice, we hold that even in light of the Supreme

2

Court's decision in Aguilar, sufficient evidence of guilt was presented at Ellis's trial. Accordingly, we affirm the district court's denial of Ellis's motion.

I.

A.

The facts presented at Ellis's trial established the following. In May 1984 Ellis acquired a twenty percent limited partnership interest in the Tri-State Greyhound Park in Cross Lanes, West Virginia. Under West Virginia state law, dog tracks are allowed to keep a specific percentage of the revenue generated by the wagers (i.e., "take-out"). In 1986 the owners of Tri-State supported a proposed bill that would have increased their "take-out" percentage. Although the bill passed both houses of the state legislature, it was vetoed by the Governor.

In 1987 a similar bill was introduced, and renewed efforts were made to obtain support for it. To this end, Tri-State promised to pay Ellis $500,000 if the bill became law. Ellis proceeded in a variety of allegedly fraudulent ways to assure passage of the bill. With the help of Janet Ellis, his former wife, he made contact with and worked primarily through Samuel D'Annunzio, a West Virginia lobbyist.

Among other things, Ellis provided sums of cash to D'Annunzio to be used to influence various state legislators, including State Senator Larry Tucker and State Senate President Dan Tonkovich. D'Annunzio promised Tucker $10,000 if he could "fix the House" with regard to the bill, and Tucker accepted the money and contacted the Speaker of the House of Delegates on behalf of the legislation. D'Annunzio reached a similar understanding with Tonkovich. However, Tonkovich did not actually receive any cash payments because Ellis told D'Annunzio to hold the money until the legislative session was over.

The West Virginia legislature eventually passed, and the Governor signed, the 1987 bill. After reports of questionable financial arrangements surfaced between D'Annunzio and the bill's original sponsor,

3

State Senator Si Boettner, a federal investigation was initiated into charges of corruption surrounding the passage of the bill. Thereafter, D'Annunzio entered into a plea agreement with the federal government in which he agreed to cooperate with the investigation in an undercover capacity.

D'Annunzio met with Tucker on August 5, 1988, and Tucker returned the $10,000 previously given him. On September 28, 1988, D'Annunzio arranged to meet Ellis for the ostensible purpose of returning the $10,000 he had retrieved from Tucker. The meeting was recorded by federal agents who immediately executed a search warrant and seized the $10,000 from Ellis. Two days later, Ellis was informed that he was a target of a grand jury investigation.

After being informed that he was under investigation, Ellis met with his ex-wife, Janet Ellis, and provided her with a written collection of false statements that she was to provide federal authorities if contacted. Ellis wanted Janet Ellis to say that D'Annunzio volunteered to work on the "take-out" bill, that D'Annunzio was a manipulative person who "played games," and that Ellis had paid D'Annunzio $25,000 as a lobbying fee. Ellis also sought to have Janet Ellis tell federal investigators that Ellis owed D'Annunzio money on a gambling debt.

On December 4, 1988, D'Annunzio committed suicide. Ellis then told Janet Ellis that he was "off the hook" because everything that had transpired between him and D'Annunzio had been "one on one." However, on the basis of information provided by D'Annunzio before he died and by Janet Ellis, a federal grand jury returned an indictment against Ellis.

B.

Ellis was charged with eight counts of Hobbs Act, mail fraud, racketeering, and obstruction of justice violations. On May 17, 1990, a jury convicted Ellis on six counts consisting of two substantive counts of causing extortion, in violation of the Hobbs Act, 18 U.S.C. §§ 1951 & 2, and one count each of conspiracy to cause extortion, 18 U.S.C. § 1951, racketeering, in violation of the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. #8E8E # 1962(c) & 1, con-

4

spiracy to violate RICO, 18 U.S.C. § 1962(d), and obstruction of justice, 18 U.S.C. §§ 1503 & 2.

Five predicate acts formed the basis of the RICO convictions. These five acts included the two substantive Hobbs Act violations, one act of bribery and one act of attempted bribery under West Virginia state law, W. Va. Code § 61-5A-3, and the obstruction of justice violation. The state bribery acts were based on the same transactions as the two substantive extortion charges under the Hobbs Act.

The trial court sentenced Ellis to 107 months imprisonment and fined him $50,000. On appeal we affirmed Ellis's conviction and sentence. United States v. Ellis, 951 F.2d 580 (4th Cir. 1991). The Supreme Court denied his petition for writ of certiorari. 505 U.S. 1220 (1992).

On August 9, 1993, Ellis filed this motion for collateral relief under 28 U.S.C. § 2255. Ellis's motion was referred to a United States Magistrate Judge for a report and recommendation. On January 11, 1994, the magistrate judge recommended that Ellis's motion be denied. Ellis then filed objections with the district court. On June 10, 1994, the district court entered a memorandum order denying the motion for collateral relief. This appeal followed.

II.

A.

Ellis first complains that the jury instructions pertinent to his Hobbs Act convictions were improper in light of the Supreme Court's subsequent decisions in McCormick v. United States, 500 U.S. 257 (1991), and Evans v. United States, 504 U.S. 255 (1992). In particular, Ellis argues that the decisions in McCormick and Evans establish that a jury must be instructed that a defendant does not violate the Hobbs Act unless some property (e.g., money) was obtained as a quid pro quo for some act made under the color of official right. Because the trial court failed to so instruct the jury at Ellis's trial, Ellis contends that his Hobbs Act convictions must be vacated.

5

Ellis's counsel did not raise the quid pro quo argument either at trial or on direct appeal. Accordingly, to obtain collateral relief Ellis must demonstrate both "(1) `cause' excusing his double procedural default, and (2) `actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 168 (1982); United States v. Maybeck, 23 F.3d 888, 891 (1994). More specifically, to establish "cause" Ellis must "show that some objective factor external to the defense impeded counsel's efforts . . . .[For example,] a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . would constitute cause under this standard." Murray v. Carrier, 477 U.S. 478, 488 (1986); see Reed v. Ross, 468 U.S. 1, 11 (1984) (to establish cause for a claim that was defaulted on appeal, a habeas petitioner must show that his claim is "so novel that its legal basis is not reasonably available to counsel"). See also Engle v. Isaac, 456 U.S. 107, 130 (1982) ("the futility of presenting an objection to the state courts cannot alone constitute cause for a failure to object at trial"); id. at 134 ("Where the basis of a constitutional claim is available, and other defense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default.") (footnote omitted).

As for prejudice, when, as here, a convicted defendant seeks to obtain collateral relief based on alleged errors in jury instructions, a showing of "plain error" under Rule 52(b), Fed. R. Crim. P., is not sufficient. Frady, 456 U.S. at 168 ("a prisoner must clear a significantly higher hurdle than would exist on direct appeal"). Instead, the burden falls on Ellis to show, "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 170 (emphasis in original). Thus, the issue turns on "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process, not merely whether the instruction is undesirable, erroneous, or even universally condemned." Id. at 169 (citations and internal quotes omitted).

As discussed below, Ellis has failed to show prejudice. We therefore need not determine whether cause exists.

6

B.

The Hobbs Act, 18 U.S.C. § 1951, provides in pertinent part that:

> (a) Whoever in any way or degree obstructs, delays, or affects commerce . . . by . . . extortion . . . in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

> (b) As used in this section--

\* \* \*

> (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under the color of official right.

(Emphasis supplied.)

At Ellis's trial, the court instructed the jury as to the following statutory elements that must be proved in order to establish a Hobbs Act violation:

> Obtaining payment or property under color of official right means the obtaining of money or property by a public official when the money obtained was not lawfully due and owing to him or to his office. It does not matter whether the public official induced or caused the payment by promising to perform his duties or not to perform or to refrain from performing certain acts.

\* \* \*

> If the public official knows the motivation of the individual making the payment is the public official's office, and money is obtained or attempted to be obtained by the public official which was not lawfully due and owing to him or to the office he represented, that is sufficient to satisfy the gov-

7

ernment's burden of showing misuse of office and extortion or attempt of extortion under color of official right. . . .

. . . It is sufficient if the evidence shows that the individual making or promising payment were (sic) motivated to deliver money to someone as a result of the public official's position.

* * *

It is not necessary that the government prove that any public official, including Senators Tonkovich, Tucker, or Governor Moore, committed or promised to commit a quid pro quo, that is, an official action in return for the payment of money. <u>Such a quid pro quo may, of course, be forthcoming in this sort of case, or it may not. In any event, it is not an essential element of the crime that the United States needs to prove.</u>

(Emphasis supplied.)

In <u>McCormick</u>, however, the Supreme Court held that a quid pro quo jury instruction is required under the Hobbs Act in cases where a person is alleged to have acted under the color of official right and received a "campaign contribution" in return for the performance of, or abstaining from an official act. 500 U.S. at 273-74. Thereafter, in <u>Evans</u>, the Supreme Court extended the holding of <u>McCormick</u> to non-campaign contribution cases. <u>Evans</u>, 504 U.S. at 268 (holding that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts").

Subsequently, this circuit applied the rulings in <u>McCormick</u> and <u>Evans</u> to reverse the conviction of a state legislator accused of accepting campaign contributions in violation of the Hobbs Act. <u>United States v. Taylor</u>, 966 F.2d 830 (4th Cir. 1992), <u>aff'd on reh'g</u>, 993 F.2d 382 (4th Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 249 (1993). In <u>Taylor</u>, the jury was told that:

8

> There need be no specific quid pro quo to establish extortion under color of official right. That is, the government need not prove that the defendant promised to do something in particular in return for the payment of money. Of course, if you find that a quid pro quo did exist, that would be evidence of misuse of office. So long as a defendant knows that the money sought would be paid because of the public office involved, there need be no promise with respect to official action in return for payment. In other words, the essence of the offense is the corrupt effort to obtain payment of the powers public office (sic) and not solely as a result of the powers of a private individual.

993 F.2d at 385 (emphasis in original).

We held that such an instruction was defective and reversed the defendant's conviction. We said that:

> It is necessary for the prosecution to prove under the Evans standard "that a public official has obtained a payment to which he is not entitled, knowing that the payment was made in return for official acts." Or, if the jury finds the payment to be a campaign contribution, then, under McCormick, it must find that "the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act."

Id. (quoting Evans, 504 U.S. at 268; McCormick, 500 U.S. at 273).

Here, although Ellis did not make payments under the guise of "campaign contributions," his case falls within the holding of Evans. Indeed, when taken together, the decisions in McCormick, Evans, and Taylor show that Ellis's jury was improperly instructed on the Hobbs Act charges.

Again, however, merely because Ellis has established error does not in turn establish prejudice for purposes of this section 2255 motion. In addition, while it is true that a jury must find the defendant guilty of all the elements of the crime with which he is charged before

9

a conviction can be properly obtained, e.g., United States v. Gaudin, 115 S. Ct. 2310, 2314 (1995), it does not necessarily follow that Ellis's Hobbs Act convictions must be set aside under the particular circumstances of this case.

We say this because Ellis's jury was not only instructed on the Hobbs Act offenses, but it was also instructed on the elements of bribery under West Virginia state law. As we have noted, the two state bribery acts were based on the same transactions as the two substantive extortion charges under the Hobbs Act. And, of course, before Ellis's jury could find that he committed the two predicate acts of state bribery, it would have to find that Ellis committed all the elements of the crime of bribery. Thus, if the trial court's instructions on the predicate acts of state bribery covered the quid pro quo element, then Ellis's jury must have found that element satisfied, and Ellis suffers no prejudice within the meaning of Frady .

For instance, in United States v. Hairston, 46 F.3d 361 (4th Cir. 1995), we recently upheld Hobbs Act convictions on direct appeal even though the jury was not given an express quid pro quo instruction on the Hobbs Act charges. Among other things, we concluded that the failure to provide an express quid pro quo instruction was harmless error under Rule 52(a), Fed. R. Crim. P., when the district court's explanation of bribery in other counts charged in the indictment included the concept of quid pro quo. Id. at 373-74. It, therefore, follows that so long as Ellis's jury was instructed on the concept of a quid pro quo as it relates to the predicate acts of state bribery, he has failed to establish prejudice on this collateral attack requiring that his Hobbs Act convictions be set aside.**1**

_____

**1** Moreover, while Ellis has argued that the erroneous jury instruction was outcome determinative because the evidence did not demonstrate the existence of a quid pro quo with respect to either Senator Tucker or Senator Tonkovich, Ellis has not argued that his Hobbs Act convictions must be set aside because he is "actually innocent," see Murray v. Carrier, 477 U.S. 478, 496 (1986), and because there was insufficient evidence presented to the jury to support his convictions. See Jackson v. Virginia, 443 U.S. 307, 324 (1979). Of course, even had Ellis made these arguments, we would still be required to affirm his Hobbs Act convictions because the record shows that the jury was presented with more than sufficient

10

Turning then to Ellis's trial and the jury instructions on the West Virginia bribery statute, the trial court first made clear that the transactions underlying the predicate acts of state bribery were identical to the transactions underlying the Hobbs Act charges:

> Act one is alleged to be a violation of the Hobbs Act, the extortion statute, and also alleged to be a violation of the West Virginia bribery statute. So under racketeering act number one, the special verdict form, is going to have an entry for each of those. Now, the racketeering act will be made out if it were proved as to either. Of course, you may find it's proved as to both. You may find it's proved as to neither, in which event it would not be made out at all.

> The court does want to pause for a moment, though, and take up the West Virginia bribery statute phase of this with you. We've been through the Hobbs Act extortion. You understand that in count two, which is housed in this racketeering act number one, and it's whether or not the same act, if it existed at all, would constitute a violation of the state statute.

The trial court then specifically instructed the jury on the elements of the West Virginia bribery statute. As the court explained:

_____

evidence establishing the quid pro quo element, though the jury was also presented with conflicting evidence from which it could have found otherwise. For example, while Ellis denied that he had given D'Annunzio money to improperly influence passage of the "take-out" bill, the jury was presented with evidence showing that Ellis had told D'Annunzio that he could pay him $20,000 "to get the bill moving." Furthermore, Senator Tucker testified that D'Annunzio had attempted to get his help on the "take-out" bill and that he had said "I'll take care of you" or "I'll see that there's something in it for you." D'Annunzio then paid $10,000 to Senator Tucker, which Tucker eventually returned to D'Annunzio. D'Annunzio then returned the $10,000 to Ellis, a transaction observed by federal agents. Certainly, this evidence provides an ample basis from which a rational juror could find "that a public official has obtained a payment to which he is not entitled, knowing that the payment was made in return for official acts." Evans, 504 U.S. at 268.

11

The West Virginia bribery statute provides, in pertinent part, that:

"A person is guilty of bribery . . . if he offers, confers or agrees to confer to or upon another . . . directly or indirectly:

"Any pecuniary benefit as consideration for the recipient's official action as a public servant."

Now, for purposes of that state statute, let me define the following terms:

Benefit means a gain or advantage, or anything regarded, or which might reasonably be regarded by the beneficiary as a gain or advantage.

Pecuniary benefit in the form of money, tangible or intangible property, or anything else the primary significance of which is economic gain.

Official action means a decision, report, vote, or other exercise of discretion.

Public servant means any officer, whether executive, judicial, legislative, or ministerial, and whether elected or appointed, or an employee of the state.

(Emphasis supplied.)

We hold that this jury instruction adequately covered the concept of quid pro quo required under Evans. Without doubt, the instruction that the act of state law bribery requires conferring a "pecuniary benefit as consideration for the recipient's official action as a public servant" sets forth the Government's obligation to "show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Evans, 504 U.S at 268. In fact, the instruction called for under Evans and the instruction on the state bribery statute given here are nearly identical. We

12

therefore affirm the district court's decision to deny Ellis's motion to vacate and set aside his Hobbs Act convictions. **2**

III.

Ellis challenges his obstruction of justice conviction arguing that in light of the Supreme Court's recent decision in <u>United States v. Aguilar</u>, 115 S. Ct. 2357 (1995), insufficient evidence of guilt was presented at trial. In particular, Ellis argues that <u>Aguilar</u> requires a temporal nexus between the alleged obstruction and the criminal investigation, and that in his case no such nexus exists because when he attempted to induce his ex-wife, Janet Ellis, to provide false testimony, she had not yet been contacted by the federal authorities. We disagree.**3**

_____

**2** As well as attacking his Hobbs Act convictions based on the trial court's failure to provide a specific quid pro quo instruction, Ellis attacks his RICO convictions based on the same argument. He argues that the trial court's instruction to the jury that it need not find a quid pro quo to convict him of the Hobbs Act charges tainted the jury's finding that he committed the predicate acts of state bribery. Thus, according to Ellis, the RICO convictions must be set aside because both the Hobbs Act and state bribery predicate acts are invalid. <u>See United States v. Martinez</u>, 14 F.3d 543 (11th Cir. 1993). The flaw in this logic is, however, apparent. We assume that a jury follows its instructions. We, therefore, must assume that Ellis's jury found a quid pro quo because it found that Ellis did in fact commit the predicate acts of state bribery. With that finding, it is clear that Ellis's jury would have found a quid pro quo with respect to the Hobbs Act counts. <u>See Hairston</u>, 46 F.3d at 373-74. <u>Cf. McCormick</u>, 500 U.S. at 274-75 (rejecting Government's theory that appellate court could infer the existence of quid pro quo under Hobbs Act based on jury's determination that defendant was guilty of income tax violation because the jury might have inferred that payments were not voluntary and, therefore, taxable even though they were campaign contributions); <u>Martinez</u>, 14 F.3d at 553 n.5 (noting that the jury instructions concerning the state law claims failed to instruct on quid pro quo). Thus, for the same reasons that we affirm the district court's denial of Ellis's motion to the extent that it seeks to vacate and set aside his Hobbs Act convictions, we also affirm the district court's denial of Ellis's motion to vacate and set aside his RICO convictions.

**3** Ellis also argues that he is free to raise his sufficiency of the evidence challenge on collateral attack even though he failed to do so at trial or

13

The obstruction of justice statute, 18 U.S.C. § 1503, provides in pertinent part that:

> Whoever . . . corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or <u>endeavors to influence, obstruct, or impede, the due administration of justice</u>, shall be fined not more than $50,000 or imprisoned not more than five years, or both.

(Emphasis added.)

In <u>Aguilar</u> the Supreme Court adopted the "nexus" requirement, which demands that the Government show that the alleged obstruction of justice has "a relationship in time, causation, or logic with the judicial proceedings." 115 S. Ct. at 2362. In other words, the "endeavor[ ] to influence" must have the "natural and probable effect" of interfering with the due administration of justice. <u>Id.</u> Without such a nexus or effect, the Government cannot show the requisite intent to obstruct justice. <u>Id.</u> The Court then found that no nexus or effect had been shown under the facts presented in that case.

_____

on direct appeal. That is, Ellis argues that because the decision in <u>Aguilar</u> shows that he is "actually innocent" of obstructing justice, he need not meet the cause and prejudice requirement of <u>Frady</u>. <u>See Murray v. Carrier</u>, 477 U.S. 478, 496 (1986) (stating that "where a constitutional violation has probably resulted in the conviction of one who is actually innocent," cause and prejudice for the procedural default need not be shown); <u>Kuhlmann v. Wilson</u>, 477 U.S. 436, 454 (1986) (concluding that "the `ends of justice' require federal courts to entertain [federal habeas] petitions only where the prisoner supplements his constitutional claim with a colorable showing of factual innocence"). Often, of course, a claim of actual innocence arises when new evidence is presented on collateral attack. <u>See</u>, <u>e.g.</u>, <u>Schlup v. Delo</u>, 115 S. Ct. 851 (1995); <u>Herrera v. Collins</u>, 506 U.S. 390 (1993). In this case, however, Ellis does not present any new evidence to support his claim of actual innocence. Instead, he relies on the application of a Supreme Court decision (<u>i.e.</u>, <u>Aguilar</u>) that was rendered after his direct appeal became final. Because we proceed directly to the merits, we need not decide whether Ellis is seeking to overcome <u>Frady</u>'s "cause and prejudice" requirement based on a claim actual innocence or whether Ellis is seeking and is entitled to the retroactive application of a new decision affecting substantive law.

14

In particular, the evidence presented in <u>Aguilar</u> showed that the defendant (a federal district court judge) lied to FBI agents about his participation in an embezzlement case and his knowledge of a wiretap authorized by another district court judge. <u>Id.</u> at 2361. At the time that the defendant lied to the agents, the defendant was aware that a grand jury had commenced an investigation of an alleged conspiracy to influence the embezzlement case. The grand jury had not, however, "authorized or directed the FBI investigation," <u>id.</u>, and the Government failed to show that the agents acted as "an arm of the grand jury" or that the grand jury had even summoned the particular agents to testify. <u>Id.</u> at 2362. Therefore, the Court held that it was "speculative" as to what use would be made of the defendant's false statements and that it could not be said that the "natural and probable effect" would be the interference with the due administration of justice. <u>Id.</u> at 2363. The Court made clear that "uttering false statements to an investigating agent--and that seems to be all that was proven here--who might or might not testify before a grand jury is [not] sufficient to make out a violation . . . of § 1503." <u>Id.</u> at 2362.

The Court also provided a hypothetical to rebut the dissent's assertion that it had read the word "endeavor" out of the statute. As the Court stated:

> Under the dissent's theory, a man could be found guilty under § 1503 if he knew of a pending investigation and lied to his wife about his whereabouts at the time of the crime, thinking that a FBI agent might decide to interview her and that she might in turn be influenced in her statement to the agent by her husband's false account of his whereabouts. The intent to obstruct justice is indeed present, but the man's culpability is a good deal less clear from the statute than we usually require in order to impose criminal liability.

<u>Id.</u> at 2363.

No doubt one can draw some similarities between Ellis's case, the facts in <u>Aguilar</u>, and the hypothetical provided by the Court. When Ellis spoke to his ex-wife, he knew that he was under grand jury investigation. Also, Janet Ellis had not yet been subpoenaed or contacted by federal authorities. Thus, as with the FBI agents in <u>Aguilar</u>,

15

Ellis did not attempt to influence the testimony of a person acting as an arm of the grand jury or a person the grand jury had summoned to testify. And, as with the hypothetical, Ellis attempted to create a false story through his wife (albeit his former wife in this case). This, however, is where the similarities end, and we conclude that the differences are dispositive.

Specifically, Ellis did more than merely lie to a person who might or might not be called to testify before a grand jury. The evidence shows that Ellis instructed Janet Ellis to lie on his behalf. That is, Ellis provided his ex-wife with a written collection of false statements that she was to provide federal authorities if contacted. Thus, unlike the defendant in Aguilar, Ellis attempted to have another person commit perjury on his behalf.

Moreover, Ellis instructed Janet Ellis to lie on his behalf after federal agents had executed a search warrant and seized the $10,000 that D'Annunzio had returned to Ellis, a transaction that the agents recorded. And, unlike the federal agents in Aguilar or the Court's hypothetical, Janet Ellis was actually involved in the underlying transaction. As the Government points out, Janet Ellis set up the contact between D'Annunzio and Ellis on the "take-out" bill. Therefore, once Ellis became aware that he was a target of a grand jury investigation, one could reasonably presume--as did Ellis--that Janet Ellis would be called to testify.

Thus, when taken together, the fact that Ellis instructed his ex-wife to lie on his behalf, the fact that his instructions came on the heels of the agents' search and seizure of the $10,000, and the fact that Janet Ellis was involved in the underlying transaction distinguish this case from Aguilar and the Court's hypothetical. These facts provide sufficient evidence from which a rational juror could conclude that Ellis had the intent to obstruct a pending grand jury investigation and that the "natural and probable effect" of his efforts would be the interference with the due administration of justice. In short, there is sufficient evidence to show that Ellis's endeavor to obstruct justice had a relationship in time, causation, and logic with judicial proceedings. Aguilar, 115 S. Ct. at 2362.

16

IV.

The district court's decision denying Appellant Ellis's section 2255
motion is affirmed.

<u>AFFIRMED</u>

17